13 U.S. 104
 9 Cranch 104
 3 L.Ed. 671
 ARNOLD AND OTHERS
v.
THE UNITED STATES.
 Feb. 23, 1815
 
 ERROR to the Circuit Court, for the district of Rhode Island,
 in an action of debt, upon a bond in the penalty of 3400 dollars, given July 2d, 1812, for duties at the custom house. The cause was decided below upon demurer to the pleas of the Defendants who were the principal and sureties in the bond.
 It was an action of debt on a bond, dated July 2, 1812, given to the United States for $3400. The condition of the bond, is as follows, viz. 'The condition of this obligation is such, that if the above bounden, S. G. Arnold, &c. shall and do, on or before the 2d day of October next, well and truly pay or cause to be paid unto the collector of the customs for the district of Providence for the time being, the sum of $1700, or the amount of duties to be ascertained as due, and arising on certain goods, wares and merchandize entered by the above bounden S. G. Arnold, as imported in the brig Dover, R. Fenner, master, from Havanna, as per entry dated this day, then the above obligation to be void, &c.' The following indorsement is on the bond, viz.
 'Amount of duties ascertained as due, 1708 dollars and 38 cents.
 THOMAS PECKHAM, Junr.
 Deputy Collector.'
 The Defendants pleaded, that, as to 1708 dollars and 38 cents, part and parcel of said sum of 3400 dollars demanded by the Plaintiffs, with the interest thereon from the day whereon the same was payable, to the time of the plea, being 13 dollars and 38 cents, they owe the Plaintiffs the same, being in the whole the sum of 1721 dollars and 76 cents; and that as to the whole residue of the sum demanded, the Defendants say, that therefor the Plaintiffs, their said action ought not to have and maintain, because they say, 'that the brig Dover in the condition of the said bond mentioned, sailed from Havanna, on the 16th day of June, A. D. 1812, bound to the said district of Providence, and that she arrived within the United States, on the 30th day of June, 1812, and within the said district of Providence, on the 1st day of July, A. D. 1812, having on board the said goods, &c. mentioned in the condition which said goods, &c. were imported into the said United States, on the said 30th day of June, 1812, and into the said district of Providence, on the said 1st day of July, 1812, in the brig Dover, &c. that Providence is the sole port of entry in the said district of Providence, and that on the said 2d of July, 1812, the said goods, &c. were duly entered at the custom house in the said district of Providence, as imported in the said brig Dover, &c. the Defendants further aver, that the bond aforesaid, was made, executed and given by them to the Plaintiffs as aforesaid, for securing the duties due on the said goods, so imported as aforesaid, in conformity with, and by virtue and in pursuance of, the act of the congress, & c. passed on the 10th day of August, 1799, entitled 'an act making further provision for the payment of the debts of the United States,' and also a certain other act of congress, passed on the 7th day of June, 1794, entitled 'an act laying additional duties on goods, &c. imported into the United States.' The Defendants also aver, that the duties due by the acts aforesaid, on the importation of said goods, &c. in manner aforesaid, amounted at the time of the importation of the same as aforesaid, to the aforesaid sum of 1708 dollars and 38 cents, and no more, and were then and there ascertained by the said deputy collector, to that sum and no more, according to the condition of said bond, and in pursuance of the provisions of said statutes. They also aver, that at the time of the entering of the said goods, &c. at the custom house, as aforesaid, on the said 2d day of July, 1812, neither they, the Defendants, nor the collector of the customs for said district of Providence, had any knowledge of the act, entitled 'an act for imposing additional duties upon all goods, &c. imported from any foreign port or place, and for other purposes,' passed on the 1st day of July, 1812; nor was the said last mentioned act promulgated, published and made known, at the district of Providence as aforesaid, at the time of making the said entry, as aforesaid, and this the Defendants are ready to verify, &c.
 To this plea, the Plaintiffs demurred.
 In the Circuit Court, judgment was rendered for the Plaintiffs, for 3428 dollars and 90 cents.
 PITKIN, On the part of the Plaintiffs in error, contended,
 1. That the act imposing double duties could not, on principles of law, or justice, be considered as in operation until the 2d day of July. The words of that act are: that 'an additional duty, &c. shall be levied and collected upon all goods, &c. which shall, from and after the passing of this act, be imported into the United States, &c.'
 The act was approved by the president on the 1st day of July, 1812. By the sound construction of the words, 'from and after the passing of this act,' it is contended that the first day of July, must be excluded; that the meaning is the same, as if the words used had been from and after the 1st day of July, in which case the 1st day of July would certainly be excluded, and the act would not be in force until after that day. 'From and after the passing this act,' have also the same meaning, as from and after the time, of passing the act. The question would then occur, as it now does, when or at what time was the act passed, the answer is on the 1st day of July, and of course, unless there are fractions of a day, the duties could not be levied and collected until after that day. The act repealing the duty on salt passed in 1807, declares, 'that from and after the 31st day of December next, so much of any act as lays a duty on imported salt, be and the same is hereby repealed, and from and after the day last aforesaid, salt shall be imported, &c. duty free.'
 No one has ever pretended, that salt could be imported duty free, until the 1st day of January, because it could not be so imported, until from and after the day preceding. The Court must undoubtedly give such a construction to the act, as that no citizen can, by possibility be subjected to its operation before it had actually passed. In order to prevent this, the Court must either exclude the 1st day of July altogether, or they must admit fractions of a day, and suffer an enquiry into the very moment of time on that day, when the act received the signature of the president, and was lodged in the office of the secretary of state.
 If a vessel had arrived in the morning of the 1st day of July, and the act was not in fact approved by the president, until the afternoon of that day, it cannot be pretended, that the goods brought in such vessel, were imported 'from and after the passing of the act.' It is well known, that acts are not generally presented to the president for his approbation, until about the middle of the day, and on the last day of the session, frequently not until nearly the last hour of the day. The difficulties however, attending an enquiry of this nature, as well as the impropriety of calling on the president for information, as to the moment when a law received his sanction, may perhaps be sufficient inducements for the Court to say, that when the rights and interests of the citizens are so materially involved, and when by the express words of the act, it is not to take effect, until from and after the passing of the same, they will, as a general rule exclude the day on which it passed. The authorities, which have a bearing on this question are various and contradictory. In the case of Pugh & wife v. Duke of Leeds, Cowper 714, these authorities are referred to and commented upon by lord Mansfield with his usual ability and sound sense.
 Much more subtlety than argument has been used to prove a difference in the meaning of words made use of, in instruments, to shew the time, when they should take effect. When the words have been 'from the date,' the Court have sometimes said, it should include the day, and where the words have been 'from the day of the date,' it should exclude the day. In some cases the Courts have entirely rejected this distinction, and have said, that they do or may mean the same thing. In the case of Bellasis v. Hester, 1 Lerd Raymond, 280, on a bill of exchange, payable 10 days after sight, the Court, two judges against one, decided, that the day on which the bill was presented for payment was included. This opinion, however, was against the custom and practice of merchants. In the case of Hatter v. Ash, 1 Lord Raymond, p. 85, the following distinction is made by counsel, and is admitted by one of the judges, and not contradicted by the others, 'that the words' from the date when used to pass on interest included the day, aliter, when used by way of computation on matters of account.' This distinction is in some measure recognized by lord Mansfield, in the above case of Pugh & Leeds, in Cowper. In this last case lord Mansfield says, that the words 'from the date,' or 'from the day of the 'date,' may be either inclusive or exclusive, according to the subject matter, and may be construed either way, to give effect to the transaction, or for the furtherance of justice between parties. In the case now before the Court, it is not necessary to include the day, for the purpose of giving effect and validity to the law; and in case the day is included, manifest injustice may, and in all probability will happen to the citizens of the United States. For, if there can he no fractions of a day, the act must in legal contemplation be considered as in force, from the first monent of the day, on which it received the sanction of the president. It is understood, that by the construction at the treasury, the 1st day of July, is excluded, and that the accounts of the collectors of the customs are all settled, excluding double duties, on goods which arrived on that day.
 2. Even if the act went into operation on the 1st day of July, then was this case a complete importation, before that time. The vessel and cargo arrived within the U. States, and within the limits of the state of R. Island, on the 30th day of June, and the importation was then perfected. Importation does not imply a bringing into any particular port, to which the vessel may be destined; a bringing within the jurisdictional limits of the U. States, either on land or water, is an importation. Importing and bringing into the U. States, are used synonimously in various sections of the collection law, and the fair interpretation of both expressions is, that an importation is no more than voluntarily introducing property within the jurisdiction of the United States generally, and does not require its actual arrival at the port of its destination. The moment a cargo so arrives within the United States, and before it reaches its port of destination, the right of the United States, attaches to it. A manifest of the cargo must be delivered to their officers, and the cargo subjected in some degree to their control. The U. States then have, at least, an inchoate right to duties, of which the owner, cannot deprive them except by exportation, without unlading; the right to the duties accrues, on the first entry of the vessel into the waters of the United States, and not after her arrival at her port of destination; and no new right, on such arrival, accrues, except the secondary right of ascertaining the amount of duties to be paid, and the extent of the security required for them, which could not be ascertained, till after an actual entry at the custom house. The coming in of the vessel to the waters of the United States, her proceeding to her destined port, her entry there, is one transaction, and is one act in relation to duties; and when she reaches her destined port and enters there, the right of the United States attaches as from the first moment of her coming within the jurisdictional limits of the United States, and the responsibilities of the owner cannot be increased or varied to his injury, by subsequent acts of the government.
 The 36th section of the law clearly liscriminates between importation and entry. By the collection law, and all the forms of manifest, entry, &c. it is clearly evinced that importation precedes entry.
 To constitute an importation, there must be a voluntary bringing of goods into the United States; the vessel must be bound to the United States, with an intent there to unlade her cargo, or to enter the same for exportation without unlading.
 Coming in by stress of weather or other necessity is not a legal importation.
 By a construction given to the navigation acts of Great Britain, coming into a port, with an intent to unlade, although bulk be not broken, is an importation, but a mere coming within the limits of a port, without any intent to break bulk, or unlade, is not an importation, either to make the customs become due, or to subject the ship or goods to forfeiture, or to oblige the master to report or make entry, &c. (Reeve's History of the law of shipping, 260.)
 So goods siezed in a ship 20 miles below the Hope, but within the limits of the port of London, are considered is an importation, (Reeves, p. 261.)
 It is believed also, that, under our non-importation law, arrival at any particular port of destination, is not necessary to constitute an offence under that act, but that if the vessel is bound to the United States with an intent there to unlade her cargo, the forfeiture is incurred the moment the vessel voluntarily enters the limits of the United States. The words in the collection law and non-importation act, are the same, viz. 'Imported into 'the United States,' &c.
 3. If, however, the importation was not so complete, as that the duties accrued, on the arrival of the vessel within the jurisdictional limits of the United States; it is contended, that the importation was perfected, and the right of the United States to duties complete, on her arrival within the limits of any district of the customs of the United States.
 The vessel, in the case before the Court, as is confessed by the pleadings, arrived within the limits of the district of Providence, which is about 20 miles, within the jurisdictional limits of the United States, on the 1st day of July; and if, in the fiscal sense of the term, this constituted an importation, and the law did not take effect until the 2d day of July, the goods so imported, cannot be subject to the duties imposed by that act. We are aware of the decision of the Court, in 1810, in the case of the United States v. Vowell & M'Clean, in 5 Cranch. The distinction there taken by the counsel for the Defendants, between a district and a port of entry, is recognized by the Court as correct. The Court say, 'the duties did not accrue, in the fiscal sense of the term, until the vessel arrived at the port of entry.'
 But with great deference we contend that the time of importation, even in the fiscal sense of the term, is not ascertained merely by the entry of the master, or of the owner or consignee at the custom house, but by the arrival of the vessel in the United States, or within the limits of some place in the United States, designated by law. Whether this place be a port of entry, strictly so called, or adistrict, the master and owner have time given them by law, within which, after such arrival, they are allowed to make their entries at the custom house. Suppose the vessel, in this very case, had arrived at the port of Providence, on the 30th day of June, at twelve o'clock the master would be allowed, until twelve o'clock the next day, to make his first report to the collector, and he would not be obliged to exhibit a manifest of his cargo, before 48 hours after his arrival, which would not be until the 2d day of July; and the owner or consignee is allowed 16 days, after the final report of the master, to make his entry, for the purpose of paying or securing the duties. As this vessel would then have arrived, before the law passed, she could not be subject to double duties, although she might not have entered at the custom house, until after the passage of the law. There is, therefore, a material distinction between importation and entry. When a vessel, bound to the United States, with a cargo, has once arrived within certain knewn and specified limits; when she has once passed the line of demarcation fixed by law, then, at least, if not before, must the goods in such vessel be considered as legally and fiscally imported, and subject to all the provisions of law, relative to the security of duties upon them. The limits of a collection district are particularly designated by law. In every district, there is one, and but one port of entry, but in many of them, there are several ports of delivery. These ports, however, whether of entry or delivery, have no limits fixed or designated by law.
 When a vessel has arrived, 'within the limits of any 'district of the United States,' she is under the complete control of the government, and she cannot depart from such district, 'unless to proceed to some more interior district,' before a report or entry shall be made by the master, with the collector of some district, under the penalty of $400, and the custom house officers and commanders of the revenue cutters, are authorized to arrest and bring back, any vessel attempting to depart from such district, &c. (Laws United States, vol. 4, § 29. p. 326.) The provisions of the next succeeding section, viz. section 30th, p. 327, are, 'that within 24 hours after the arrival of any ship or vessel, &c. at any port of the United States, established by law, at which an officer of the customs resides, the master is to make a report of his arrival,' and within 48 hours, is to make a further report in writing, with a manifest of the cargo, &c. It is certain, that the word 'port' mentioned in this section, must be applicable to a port of delivery, at which a surveyor of the customs resides, as well as to a port of entry, at which the collector of the district resides.
 And, whether the master, according to this section, is obliged within 48 hours, after his arrival within the limits of a district, to make report and entry to the collector of such district, or within 48 hours, after his arrival at some particular port, in such district; still after the arrival of a vessel within the limits of such district, she cannot depart from the same, unless to an interior district, until the master has made a report, and exhibited a manifest of her cargo, to the collector of such district. And after such manifest has been exhibited to the collector, she is not permitted to depart from such district, with the whole or any part of her cargo, either to a foreign port, or to any other district, until bonds are given for the due entry and delivery of the goods, which are destined for another district, or if the goods are destined for a foreign port, that they 'shall not be landed in the United States, unless due entry thereof shall have been first made, and the duties thereupon paid or secured to be paid, according to law.' (Vide 32, 33 & 34 sections, pages 331-2-3 & 4.) If the goods are intended for exportation, they must be so reported in the manifests, and then the vessel importing them, may proceed 'from the district, within which such ship or 'vessel shall first arrive,' &c. on giving bond, as above stated (sect. 32.) If the goods or any part of them are destined to any other district, the vessel, in which they were brought, may proceed to such other district, on such conditions, as are specified in the 34th section. This section declares, 'that before any ship or vessel shall depart from the district, in which she shall first arrive, for another district, (provided such departure be not within 48 hours after her arrival within such district) with goods, &c. brought in such ship from a foreign port or place, &c. the master, &c. shall obtain from the collector of the district, from which she shall be about to depart, a copy of the report and manifest made by such master,' &c. Then the word district is used, and not port; and the proviso seems to shew, pretty clearly, that within 48 hours after the arrival of a vessel, within a district, a report and manifest must be made to the collector of such district.
 And when a vessel departs with goods from one district to any other district, the master is obliged within 'twenty-four hours after the arrival of such ship within any other district, so to make report or entry, to or with the collector of such other district,' &c. &c. (See page 335, sect. 34.) The condition of the bonds, in both cases, shew that the goods are considered as imported into the district, and not into particular ports, and that the bonds are given to secure the payment of the duties upon them, in case they should be landed in any other port of the United States. With regard to importation, the words of the condition are, 'whereas the 'following goods, &c. imported into the district of,' &c. In the case of the United States v. Vowel and M'Kean, the Court say, the vessel must arrive at the port of entry, before the duties accrued. If by an arrival at a port of entry, is meant that a vessel must actually go to a port of entry as established by law, before a right to the duties can attach or an entry can be made by the master or owner, the position is believed to be incorrect; as by the 19th section of the collection law, a vessel destined to a port of delivery, in many of the districts, may go directly to such a port of delivery, without even touching at a port of entry, and the master and owner, may afterwards enter the vessel and cargo, and pay or secure the duties, with the collector at the port of entry in such district, without taking the vessel or cargo to such port of entry.
 The provisions of all the sections of the law from the 23d to the 35th inclusive, relate principally, if not solely, to the conduct of the master, or person having charge of the vessel, with a cargo bound to the United States; and that the object of all the provisions in these sections, is to ascertain the amount and kind of goods, which he has imported, is to prevent their being unladen, without the assent of the government.
 If the vessel be owned in whole or in part by a citizen of the United States, the master is to have a manifest of the cargo on board; a copy of this manifest, must be delivered to an officer of the customs, if within four leagues of the coast; a like copy must be delivered to an officer of the castoms, after his arrival within the limits of any district, and a certificate of such officer is to be entered on the original manifest; the last copy is to be sent to the collector of the district in which such vessel has arrived, and the original manifest certified by such officer, must be delivered to such collector by the master, or he must make oath, that no such copy had been applied for, &c. (See 25th section, page 321-2) and the master is finally to deliver to the collector of the district under oath, a manifest containing the particulars of the cargo on board; and after this has been done by the master, the owners or consignees of goods thus imported, are to come forward and pay or secure the duties upon them; and for this purpose are to make a particular entry of such parts of the cargo, as are owned by or consigned to them. The from of this entry is given in the 36th sec. of the law. and is headed, by the words—entry of merchandize imported by,' &c.
 The complete control of the government over the vessel, from the moment of her arrival within any district, is shewn by the 53d section of the law, page 345. This section provides 'that it shall be lawful for the collector of any district in which any ship or vessel may arrive and immediately on her first coming within such district, &c. 'to put on board such ship or vessel, whilst remaining within such district, or in going from one district to another, one or more inspector, to examine the cargo, &c. and to perform such other duties,' &c. 'for the better securing the collection of the duties.'
 4. The bond was taken under the former impost law as stated in the plea, and accordingly was an explicit contract for such duties as that law imposed and no other; and whatever claim the Plaintiffs may have for double duties, no more than the single duties ought to be recovered on this bond.
 If any duties are to be paid, on account of the imported articles, beyond the tariff established by the former impost law, they are not recoverable in this action on the bond given under that law; but recourse must be had to some other process for the recovery of such further duties.
 The sureties (and in this case two of the Defendants are sureties) will not be made liable beyond the responsibility which they expected on entering into the obligation. They expected to be holden for no more than the duties under the former impost law; and the proceedings on the part of government warranted that expectation. The time of giving the bond, the district where it is taken and the penal sum, being rather less than the amount of double duties, as now demanded, evince conclusively, that the bond, with its condition was not for double duties, but for the single duties.
 Every argument, which can be urged for a demand of double duties, may be urged with equal force, and far more apparent equity to sustain some other process, in which the sureties would not be subjected to the peculiar hardship of being compelled to pay double duties, for which they could have no idea of being responsible, when the bond was given.
 This view of the case is according to the essential facts admitted by the pleadings. On the 2d of July, 1812, after the imported articles had been properly inspected, the amount of duties was ascertained and indorsed on the bond in the collector's office. The indorsement was expressed in these terms 'amount of 'duties ascertained as due, 1708 doll. 38 cents.' Bond for securing the duties being required before granting a permit to land the articles from the importing vessel, a gross estimate of the amount of duties only, could be made at the moment of taking the bond, (see section 49, page 359-60) and that estimate was 1700 dollars as mentioned in the condition.
 When the articles had been duly inspected, after the permit to land, and after return of such inspection, (see page 361-2) but not before, the duties could be and were ascertained in the regular course at the collector's office. The precise amount of duties was then ascertained according to the former impost law, and found to be 1708 dollars and 38 cents, and was so indorsed on the bond according to known provisions of law. Shall that indorsed amount be the measure of the demand on the bond? After the duties had been so ascertained and indorsed on the 2d of July, if a deposit of goods, (according to sec. 42, page 382-3) had been made for securing the amount of the duties for which the bond had been given, what would have been the measure for determining the sufficiency of such security? It was lawful for the collector, in lieu of sureties to accept of a deposit of so much of the goods, as should in his judgment, be sufficient. And this deposit, from the nature of the case, was to be received only after the articles had been landed, and consequently after the amount of duties was regularly ascertained. The deposit, therefore, must have been for securing the specific sum of 1708 dolls. and 38 cents, and only that sum when due could, by law, be charged for duties to be paid from the proceeds of the deposited goods.
 In the present case, there is no question about the fairness of the proceedings at the custom house. The whole transaction was according to the regular course of business. Whatever was uncertain in the candition of the bond, was reduced to certainty by the indorsement; and the full extent of the obligation was then settled by fair agreement of the proper agent on the part of the United States. That extent of course would be the measure of pledges to sureties. Such extent would measure the charge for duties on the part of a consignee, who might be principal in a bond. And if the consignee were ordered by an owner, who made the shipments abroad, to sell promptly and pay over the proceeds of sales, the whole might be completed and all accounts between them closed at a place remote from the seat of government, such as New Orleans, before any knowledge could there be had, of the act for imposing double duties. All the official information and proceedings within the district had united to assure him of freedom from all duties or customs, on paying the amount required according to the former impost law.
 In such a case, to exact double duties from a consignee, who had entered the goods at the custom house, would be manifest injustice. It would operate as fraud or extortion or both. Is it for this Court to believe the legislature capable of intending such wrong?
 But where is the difference in principle between such a case and the case now before the Court. New Orleans is not the only district where imported article might be sold by a consignee, or by the owner himself, under such a full conviction of being liable to single duties only, and without a possibility of just compensation or redress, if the government may afterwards surprize him by exacting double duties. If a liability to double duties were known to an owner, at the time of making entry, he might choose to have the articles entered for exportation according to the terms allowed by the general law relative to the collection of duties on imposts.
 But this privilege might be taken away, by the construction, under which the double duties are demanded in the present case.
 The intent of the parties gives a rule for decision in cases of contract. At the date of this bond, was it muttually intended to secure the payment of double duties? No such allegation is found in the pleadings; nor is such intention to be fairly inferred from the admitted facts. On the contrary, the intention fairly understood on each side, was to secure the payment of the single duties only as required under the former impost law. And this intention is apparent from the penal sum of the bond, with the gross estimate of duties as mentioned in the condition, and the ascertained amount of duties indorsed on the bond.
 As the whele transaction at the collector's office is agreed to have been fair, the fact of that indorsement is decisive to prove, that with reference to the district where the goods were entered and delivered, no rule of duties on imposts had been made known, other than the former impost law. And the general principle of all lave requires the rule to be prescribed or made known before it can be obligatory. To this principle Blackstone has reference in the first and fourth volumes of his commentaries. It is true, he has said, Ignorantia juris quod quisque tenetur scire, neminem excusat. And this he has stated, as a maxim of the Roman, as well as of the English law. But, according to him, the possibility of knowledge is essential to the obligation of knowing the law. To enforce any positiv rule as a law, before the individual could be presumed to know it, would be alike inconsisent with public justice and civil right.
 
 
 1
 Indeed, this qualification relative to the opportunity and consequent presumption of knowledge, is so essential that the statement might otherwise be questioned as deficient in accuracy. For the maxim, in terms as stated by Blackstone, is not found in the text of the Pandests indicated by his note of reference, (4 Blackstone Com. page 27,) nor does that text warrant the position stated by Blackstone as a maxim, unless it be considered as applicable to the case of a law, which might be known by every one, and which, therefore, every one is holden to know, and this may be deemed the fair import of the Latin terms, in which the position is stated. If so considered, and not otherwise, it agrees with the general doctrine of the Roman law, and is a principle of universal jurisprudence.
 
 
 2
 In relation to positive law, that principle implies the necessity of its being made known, before it can impose any obligation. Positive law is a manifestation of the legislative will; and although there may be a legislative will, it does not become a law, where it is not manifested.
 
 
 3
 There was no argument on the part of the United States.
 
 Feb. 23d. Absent. TODD, J.
 
 4
 STORY, J. delivered the opinion of the Court as follows:
 
 
 5
 The United States brought an action of debt against the Defendants on a bond given for the payment of duties on goods imported in the brig Dover into the port of Providence.
 
 
 6
 Upon the pleadings in the Court below, judgment was given in favor of the United States, and the Defendants have brought the present writ of error to reverse that judgment.
 
 
 7
 The material facts are, that the brig arrived within the limits of the United States on the 30th day of June, 1812; and within the collection district of Providence, on the first day of July, 1812. On the second day of July, an entry was duly made at the custom house and the present bond was then executed.
 
 
 8
 The principal question which has been argued is, whether on these facts the goods are liable to the payment of the double duties imposed by the act of the first day of July, 1812, ch. 112. That act provides 'that an additional duty of 100 per cent. upon the permanentduties now imposed by law, &c. shall belevied and collected upon all goods, wares and merchandizes which shall, from and after the passing of this act, be imported into the United States from any foreign port or place.' It is contended that this statute did not take effect until the second day of July; nor indeed until it was formally promulgated and published. We cannot yield assent to this construction. The statute was to take effect from its passage; and it is a general rule that where the computation is to be made from an act done, the day on which the act is done is to be included.
 
 
 9
 It is further contended that the importation was complete by the arrival of the vessel within the jurisdictional limits of the United States, on the thirtieth day of June. We have no difficulty in overruling this argument. To constitute an importation so as to attach the right to duties, it is necessary not only that there should be an arrival within the limits of the United States, and of a collection district but also within the limits of some port of entry. This was expressly decided in the case of the United States v. Vowell, 5 Cranch, 368.
 
 
 10
 Without therefore adverting to the consideration of the regularity or sufficiency of the pleadings we are all of opinion that on the merits the judgment must be affirmed.
 
 
 11
 Judgment affirmed with six per cent. damages and costs.