Howry, J.,
delivered the opinion of the court:
This case depends upon the meaning of the words “exportation" and “export” as used in the statute which allows drawback on imported materials used in the manufacture or production of articles entitled to drawback of customs duties when exported. The claim is for drawback of duties paid upon imported rape-seed oil used in the manufacture of lubricating’ oils, laden in 1895, 1896, and 1897 on vessels engaged in the foreign trade, not landed in any foreign country, but consumed on those vessels during the voyage. The statute under which the drawback is claimed is the act of August 28, 1894, 28 Stat. L., 551, and the act of July 27, 1897, 30 Stat. L., 211. The original provision (re-enacted in section 30 of the last act) is as follows:
“Sec. 22. That where imported materials on which duties have been paid are used in the manufacture of articles manufactured or produced in the United States, there shall be allowed on the exportation of such articles a drawback equal in amount to the duties paid on the materials used, less one per centum of such duties:
“Provided, That when the articles exported are made in part from domestic materials the imported materials, or the parts of the articles made from such materials, shall so appear in the completed articles, that the quantity or measure thereof may be ascertained:
*104 “And provided further, That the drawback on any article allowed under existing law shall be continued at the rate herein provided.
“That the imported materials used in the manufacture or production of articles entitled to drawback of customs duties when exported shall, in all cases where drawback of duties paid on such materials is claimed, be identified, the quantity of such materials used, and the amount of duties paid thereon shall be ascertained, the facts of the manufacture or production of such articles in the United States and their exportation therefrom shall be determined, and the drawback due thereon shall be paid to the manufacturer, producer, or exporter, to the agent of either or to the person to whom such manufacturer, producer, or exporter or ag-ent shall in writing order such drawback paid, under such regulations as the Secretary of the Treasuiy shall prescribe.”
It is contended for the claimants that the shipment of oil upon steamers and its consumption on such vessels constituted an exportation. The argument is drawn from the definition given to the verb and the contention is that the derivation of the word “ export” is ex, out of, and portare, to carry, and that this is the primary meaning which must govern. That is to sajq the exportation is sufficient when the materials are carried put of the country,
Restricted to the general definition, the etymological meaning of which is “to cany out of” or “away,” the contention would cover this case. Lexicons, however, go farther. The words “to export” haire a specific meaning. They mean “to send to a distant point, as commodities; send for sale or exchange to other countries or places.” Exports refer to merchandise or commodities in the way of commerce shipped to foreign countries. An exporter is one who ships goods, wares, or merchandise of anjr kind to a foreign country or distant place for sale. An exportation is the act or practice of exporting or of sending out commodities from one country to another for traffic or sale. These specific definitions from standard lexicons show that the mere carrying out is not the only essential to an export. Commercially, the commodities must go somewhere beyond the sea in shipments made from home ports.
The law dictionaries sustain this specific and technical meaning. Bouvier say,s exportation in common law is the act of *105 sending' goods and merchandise from one country to another. Kapalje and Lawrence say the same thing. Jacobs-Tomlins say it is the shipping or carrying out the native commodities of England to other countries. Black, English, Wharton, and others approve this specific definition and meaning. So, an exportation means, according to general understanding, the transfer of merchandise from one country to another.
The first and most elementary rule of construction is that words are used in statutes in their technical meaning if they have acquired one. From this presumption it is not allowable to depart unless adequate grounds are found either in the context or in the consequences which would result from the literal interpretation. (Endlich on Interpretation of Statutes, sec. 2.)
Besides the specific meaning given by the books, there is much uniformity in the statement that an export is the opposite of an import.
But it is said that the terms “ import” and “ importation ” merely mean “ bringing in,” and because in some of the general definitions given to those words there does not appear any restriction upon the converse words “export” and “exportation ” it is argued that taking out is all that is necessary to an exportation. Thus, it is said that in American Sugar Refining Company v. United States (181 U. S. R., 610) the court held that imported merchandise is that which arrives in this country, and it is upon that duties are to be paid, from which it is argued we must assume that exported merchandise is that which merely leaves this country.
And, by wa3r of illustration, it is further argued that the words “emigrate” and “immigrate” are used in the same sense as “ export” and “ import;” that a man who dies on a voyage is none the less an emigrant, though he may never become an immigrant, and a child born on a voyage is none the less an immigrant, though such child was never an emigrant.
In cases where shipments of merchandise for foreign ports are not completed, by reason of the destruction or loss at sea of the merchandise in transit, the practice of the Treasury is to liquidate the entries and issue the proper certificate of drawback in accordance with the requirements of the regulation, *106 after the loss and destruction of the merchandise so shipped has been duly authenticated. Under the regulations authorized to be made, this practice is the apparent counterpart of the rule adopted in American Sugar Refining Company, supra, where it was held that duties levied and collected upon an increased valuation of sugar drained on a voyage of moisture after the shipment and made more valuable by such drainage were lawful. The rule of the Treasury has never been held to include a shipment of something not intended to be landed elsewhere because such a shipment did not take the character of an export under the statute.
Those instances given which prevent an emigrant from becoming an immigrant and which make an immigrant of a child who was never an emigrant relate to persons, depend upon life and death, and create exceptions to a general rule. It is true an immigrant presupposes an emigrant, and an emigrant implies the landing of a person leaving his home for a new country. The accident of birth at sea in the one case and death in the other intervene to affect a status. An emigrant maintains that character until he lands. If he never lands, he is not an immigrant. Such cases are not analogous upon a question relating to things, and certainly are not controlling. The exportation of things under statutes giving a drawback on such things when exported are governed by fixed rules. The specific and technical definitions applicable yet remain. It was said by a former Attorney-General (Brewster), “As the legal notion of emigration is going abroad with the intention of not returning, so that of exportation is a severance of goods from a mass of things belonging to this country with the intention of uniting them with a mass of things belonging to some foreign country or other.” (17 Op. Attys. Gen., 583.) Because fish have no country of origin they, too, may become imports, though they were never exported from a foreign shore. The exception grows out of the peculiarity of such an import, even if any tariff act can be found which levies a duty upon fish.
A supposed case, of goods produced on shipboard where a tariff is laid on the landing of such goods is suggested ly the act of July 27, 1897 (par. 224, 30 Stat. L., 170, 2 Supp. R. Stat., 665), under which a duty of 5 cents a dozen is laid on eggs. *107 Counsel sajr that if a hen lays eggs on shipboard no customs officer would admit the egg’s free of duty by reason of the claim that they were not imported because not brought from a foreign country. This may bo true. It may also be true that such an interpretation by the customs officers may not be found to be the true rule. Aside from this, if the maxim de minimis non curat lex is without application to such a trivial claim, the essential of an export remains unaffected because it .is necessary that in a shipment intent must exist to carry the articles to a foreign situs.
But an importation does not merely mean a bringing in. It takes place when the vessel arrives at a port of enti’3r, intending there to discharge her cargo. The intent characterizes the act and determines its legal complexion. United States v. Vowell (5 Cranch, 658); United States v. 10,000 Cigars (2 Curt., 436); Arnold v. United States (9 Cranch, 104); Meredith v. United States (13 Pet., 486).
Judge Story says that perhaps the argument that import meant merely “ bringing into ” might be consistent with the law of nations, yet under our revenue laws he was satisfied that an importation meant not merely a bringing within our jurisdictional limits, but also a bringing into some pprt, harbor, or haven with an intent to land the goods there. The italics appear in his original opinion. (The Mary, 1 Gallison, 208.)
Our attention has been invited to the different statutes relating to drawbacks to show, for the Government, that the refund was only intended by Congress to be made on goods returned whence they came or to some other foreign country; and to prove on the other hand, for claimants, that the purpose existed bjr the later acts to avoid the effect of the first statute, which in express terms limited the drawback of duties to goods carried only to foreign ports.
But all the statutes, early and late, use the terms “export” and “exported” as used in the Constitution, and no higher or different meaning can attach to their use in the statute than that meaning which the words must receive in a constitutional sense.
The act of March 2,1799, and which now appears as section 3015 of the Ee vised Statutes, provides that “a drawback of *108 duties as prescribed by law shall be allowed and paid on all merchandise imported into the United States, in. respect to all such merchandise as shall be exported to any foreign port other than the dominions of anj'- foreign state immediately adjoining the United States, either from the district or original importation or from certain other districts.” The restriction as to contiguous territory was subsequently removed by sections 2977, 3058, and 3056, Revised Statutes. On August 5, 1861, section 3019, Revised Statutes, was enacted in order to permit the refund of duties paid, by way of drawback, on the exportation of articles manufactured wholty from imported materials. This provision enlarged section 3015, Revised Statutes. Section 25 of the act of October 1,1890, section 22 of the act of August 28,1894, and section 30 of the act of July 24, 1897, are alike, and still further enlarge the provisions of the original act by permitting the allowance on the exportation of articles manufactured wholly, or in part, of imported materials; By section 3057 the Secretary of the Treasury was authorized to prescribe such rules' and regulations not inconsistent with the laws of the United States as might be deemed necessary to cany into effect those provisions relating to drawbacks and to prevent the illegal reimportion of merchandise exported as provided. Under the authority conferred by the act of July 24,1897, drawback regulations were prescribed. By them a party intending to export with the benefit of drawback any merchandise on which duty had been paid was required to file with the collector an entry naming the vessel or com^ance in which and the place to which the merchandise was to be exported. Other articles provided for a bond for the production of proofs of landing abroad. Thus we have a departmental construction which is entitled to great respect, and though the departmental regulations do not override the law (Campbell’s case, supra;), contemporaneous construction bjr those charged with carrying the law into effect ought not to be rejected without cogent reasons. United States v. Moore (95 U. S. R., 760), Brown v. United States (113 U. S. R., 568), and numerous other authorities.
Especial^ ought the departmental construction to be given weight since no decision has been disclosed in the course of the century succeeding the act of 1799 which shows that the *109 Department viewed the term /^export” as relating to anything but foreign commerce. It is true that in 1889 the Department decided that merchandise used as ships’ stores was not entitled to the drawback, but that decision can not be viewed as an admission that the principle existed any longer than necessary to call forth the decision upon the act of some subordinate making an unauthorized.allowance.
The statutes all mean that there shall be a port of destination, as in section 3330, relating to'the exportation of distilled spirits withdrawn from bonded warehouses. That statute which authorizes the cancellation of bonds required to be given for the exportation upon proof of loss at sea without neglect or fault of the owner or the shipper is in line with the regulations framed by the Secretary of the Treasury in other cases of loss'or destruction.
Regarding the statutes, then, as defining export to mean the same kind of an export referred to in the Constitution, the discussion respecting the intention to promote the protective policy in the enactment of the statutes does not seem pertinent. Framed pursuant to the paramount law, the statutes must be construed with the Constitution and all together as one law. (Cin., N. O. and T. Ry. v. Ky., 115 U. S. R., 321.)
This brings us to the adjudged cases to ascertain the original meaning, if the true meaning can be found in the opinions of the courts. Those merely persuasive will be noticed first.
Two English cases cited seem to sustain the contention of the claimants. They are supported by one American case. On the other hand, the cases in this country generall}1, are against the proposition that the exportation satisfies the statute by merely leaving the ports.
In Stockton Railway Company v. Barrett (11 Clark and Fin., 600), the question related to the meaning of the term "shipped for exportation” in a certain railway act — that is, whether those terms were confined to exportation to foreign countries or included shipments of coals to be carried coast-wise to other parts of the Kingdom. ■ It was held that the destination of a shipment was not considered in deciding its character as an export.
In Muller v. Baldwin (52 L. J., Q. B., N. S., vol. 43, part *110 2,164) the question on appeal was whether coal taken on board a vessel for use on the voyage was exported. The act did not relate to customs, and there was nothing in it to show that the word “ exported” was used in other than its ordinary sense. The court said (differing from the lower court): “ We agree as to the reasonableness of making a distinction between coals taken away for sale and coals taken for the necessary use of the vessel. There is nothing in the language of the act to show that the word ‘export’ was used in any other than its ordinary sense, namely, carried out of the ‘port.’”
In Forman v. Peaslee (Monthly L. N., vol. 21, 1859) iron appeared to have been imported into this country from Great Britain, and the question was whether the exportation began at the time the iron left Wales for Liverpool or from the latter place. The court decided that the exportation began when the iron left Liverpool.
In United States v. Forrester (25 Fed. Cases, 1152) it is said that the commercial meaning of the word “import” is directly contrary to the term “ export” and that both phrases have a technical meaning in the law. The term used is “import,” and legislation employed that term in its commercial sense, which is to bring from a foreign jurisdiction into this jurisdiction merchandise not the product of the country.
In Kidd v. Flagler, heard on appeal in the second circuit (78 Fed. Rep., 341), the appellate court reversed the judgment, but approved the original definition of the word, “export,” in the following language: “ Ordinarily goods are exported when they are carried out of the country for the purpose of being transferred to a foreign situs. The intent characterizes the act and determines its legal complexion.”
In Kennedy v. United States (95 Fed. Rep., 129) it was held that there was no exportation where bags were carried during successive voyages from one side of the ocean to the other alternately filled and emptied or landed on either side.
In Clark & Co. v. Clark (3 Woods, 408) it was held that the intent to land goods in some foreign country controls; that goods may take the character of exports while lying on shore awaiting shipment if the intent existed to take them away as stated.
In Brown v. Maryland (12 Wheat., 437) Chief Justice *111 Marshall defined imports as articles brought into the country. In that case it was said; “ Suppose' revenue cutters were to be stationed off the coast for the purpose of levying the duty on all merchandise found in vessels which were leaving- the United States for foreign countries; would it be received as an excuse for this outrage/were the Government to say that exportation meant no more than carrying goods out of the country and, as the prohibition to lay a tax on imports or things imported ceased the instant they were brought into the country, so the prohibition to tax articles exported ceased when they were carried out of the country ? ”
Counsel for claimants think that the definition of imports given by this opinion excludes any question as to countiy of origin and that the quotation offered does not justify the conclusion that the exportation was not complete when the goods left the country. The case was one where the State law of Maryland required an importer to take a license and pay a tax before being permitted to sell a package of imported goods. It was held that the law was in conflict with the Constitution.
But no such limitation is claimed in the opinion of the court in Woodruff v. Parham (8 Wall., 138), affirming Brown v. Maryland. There the court said:
“The words ‘imports’ and ‘exports’ are frequently used in the Constitution. They have a necessary correlation. * * * It is not too much to say that, so far as our research has extended, neither the word ‘export,’ ‘import,’ or ‘impost’ is to be found in the discussions on this subject, as they have come down to us from that time, in reference to anjr other than foreign commerce, without some special form of words to show that foreign commerce is not meant.”
The question at issue there was one between foreign and interstate commerce, from which it is argued that the decision is not applicable.
In Campbell v. United States (107 U. S. R., 413) the court said:
“The purpose of the drawback provision is to make duty free imports which are manufactured here and then returned whence they came or to some other foreign country — articles which are not sold or consumed in the United States.”
*112 But for the concluding part of the paragraph the decision would cover this case.
In Brown v. Houston (114 U. S. R., 622), a case not cited at the argument or appearing in the briefs, it was held that the terms “imports” and “exports” in the Constitution have reference to goods brought from and carried to foreign countries alone, and not to goods transported from one State to the other.
In Fairbank v. United States (181 U. S. R., 283) — another case overlooked at the argument — the court said that in Woodruff v. Parham (supra) it was held that the words ‘ ‘ imports ” and “exports” as used in the Constitution were used to define the shipment of articles between this and a foreign country, and not that between the States; and while therefore the case is no longer an authority as to what is or what is not an export, the proposition that a stamp duty on the article transported remains unaffected.
These decisions of the court of last resort speak for themselves. Though it is insisted that they leave the issue unsettled, we think the question has been finalty determined if the statutes are to be interpreted by the constitutional meaning of the words under consideration. That they are to be so determined we can not doubt. If the statutes were designed to give a different meaning, doubtless the difference would appear in language explicit enough to leave no room to doubt that a difference was intended. In attempting to define an export as different from that meaning which the fundamental law gave to it the statutes might be inoperative for some purposes. Of that, however, it is needless to inquire or do more than suggest that the statutes providing for drawbacks are not so framed as to mean a kind of an export different from that referred to in the Constitution. An exportation by that instrument means the landing of goods to some foreign place; that is to say, some foreign place must be the terminus in quem. Therefore oil taken from this country and consumed on a voyage does not constitute an exportation of that article. We might as well say that provisions which go out on the same ship for use on the outward passage are exported.
Our interpretation of the statutes is strengthened, if not definitely settled, by the ¡Supreme Court in the second case of *113 Dooley v. United States, decided since this opinion was prepared more than a month ago. In the supplemental brief, submitted in the meantime for claimants at our instance (but to which the defendants waive reply), it is insisted that the disci'imination drawn by the Supreme Court in the Dooley case was between foreign and domestic commerce j ust as previously, in Woodruff v. Parham, the distinction was drawn between foreign and interstate commerce; that the decision is without application, but so far as it is material here it favors the claimants in the declaration of a principle of definition, and that this principle is the general meaning of the word “export”— which must be so read as between one of two accepted definitions as to be in accord with the general object of the drawback law.
But the Supremo Court has said that the logical sequence of the case of Woodruff v. Parham is that the word “ export” shall be given a correlative meaning and applied only to goods exported to a foreign country.
Under the drawback statutes foreign destination is meant.
The petition is dismissed.