HARTWELL LUMBER CO. et al. v. UNITED STATES.

(Circuit Court, N. D. Illinois, N. D. February 8, 1904.)

No. 26,858.

1. CUSTOMS DUTIES—"PORT OF CHICAGO" DEFINED—ARRIVAL IN PORT.

Section 2767, Rev. St. [U. S. Comp. St. 1901, p. 1861], defines "port" as including "any place from which merchandise can be shipped for importation or at which merchandise can be imported." The statutes of Illinois provide that the city of Chicago shall have jurisdiction over Lake Michigan for a distance of three miles beyond the city limits, and the ordinances of that city give the city harbor master control over lake water outwardly for the same distance, between the north and south lines of the city. *Held*, as to certain barges in tow, which had reached a place within these limits, within the outer harbor works, where it was usual for such a tow to be broken up so the barges might be taken to their separate docks, that they should be considered as in the port of Chicago, for the purpose of fixing the time their cargoes became dutiable, though the arrival had not been reported at the barge office.

2. SAME—ENTRY—VALIDITY OF TENDER.

Entry of certain merchandise had repeatedly been tendered by the agent of the importers before its arrival in port, and was rejected by the customs officials for the expressed reason that the vessels carrying the merchandise had not reported at the custom house. The vessels reached port shortly before a change in the tariff laws, but were not reported to the customs officials until after the change had taken place; and the agent did not renew the tender between the time of the vessels' arrival and the time of the change of law, though remaining at the customhouse for the purpose of making entry as soon as he should be permitted to do so. *Held*, that entry could properly have been made under the old law as soon as the vessels reached port, and before they had reported, and that the reasons given by the customs officers for rejecting the entry when previously tendered justified the agent in supposing further tender to be useless until the vessels reported, and the tender was therefore not vitiated by the failure to renew it during the period between the arrival of the vessels in port and the change in the law.

3. SAME—ARRIVAL IN COLLECTION DISTRICT.

A tender of entry of merchandise after its arrival within a customs collection district, but before it reaches port, is invalid, and a collector of customs may properly reject it.

4. SAME—OPERATION OF SECTION 33, TARIFF ACT OF 1897—DATE OF IMPORTATION.

Section 33, Tariff Act July 24, 1897, c. 11, 30 Stat. 213 [U. S. Comp. St. 1901, p. 1701], provides that, "on and after the date this act shall

go into effect," imported merchandise should be subjected to the duties imposed by said act. *Held*, that this applies only to importations made prior to said date.

Application to Review a Decision of the Board of General Appraisers.

These proceedings were brought by the Hartwell Lumber Company and the Spry Lumber Company, importers, to review a decision of the Board of General Appraisers (In re John Spry Lumber Company, G. A. 5,365, T. D. 24,535) which affirmed the assessment of duty by the collector of customs at the port of Chicago.

Jacob Newman (Chester E. Cleveland, on the brief), for appellants.
Albert H. Washburn, for the United States.

KOHLSAAT, District Judge. This cause comes before the court on appeal from the decision of the Board of United States General Appraisers made June 26, 1903, overruling said lumber company's protest against the action of the collector, holding that certain importations of lumber came under the so-called Dingley bill, which went into force on July 24, 1897, at 4:06 p. m., Washington time. From the evidence it appears that the propeller Maine, having in tow the barges Pendell and Buckhout, consigned to the Hartwell Lumber Company, of Chicago, and the barge Exile, consigned to the Spry Lumber Company, of Chicago, all loaded with lumber brought from Canada, were lying to at a point somewhere between the two-mile waterworks crib and the entrance to the Chicago river. One witness says he saw them later casting their lines to the tugs, which are required in such cases to take the vessels to their several docks. He says that he could not understand why they were so long in taking their lines. They were, he says, having some trouble about whether they would be towed by the Dunham or Barry tugs. The barges did not reach the barge office, which is a little more than a quarter of a mile from the mouth of the river westerly, until 6 p. m. July 24th. The agent of the owner and consignee of these vessels made tenders of entry of the same the day before they arrived, and on the day of arrival, up to 12 o'clock m., which were refused for the expressed reason "that the vessels had not reported at the customhouse." The statutes of Illinois provide that the city of Chicago shall have jurisdiction over Lake Michigan for a distance of three miles beyond the city limits. By ordinance of the city of Chicago it is provided that the city harbor master shall have control over lake water between the north and south lines of the city for a distance of three miles out. The vessels in question were within that district. They were also within this collection district.

There are two questions which must determine the rights of the parties herein: (1) Had the Maine and her tow arrived at the port of Chicago before the Dingley bill went into effect? (2) If so, was a proper tender of entry made?

With regard to the first, the Board of General Appraisers held that the vessels had not arrived in the port. There are circumstances peculiar to this port which made it difficult to determine what constitutes the port. Section 2767 of the Revised Statutes [U. S. Comp. St. 1901, p. 1861] defines a "port" as follows: "The word 'port' as used in this title, may include any place from which merchandise can be shipped for importation or at which merchandise can be imported." Section 2601 of the Revised Statutes [U. S. Comp. St. 1901, p. 1794] provides that the district of Chicago comprises all the waters and shores of Lake Michigan within the states of Indiana and Illinois; that Chicago shall be the port of entry, and Waukegan and Michigan City ports of delivery. There is nowhere a determination of what constitutes the port of Chicago. There exist in the harbor what are termed the "Government Pier" and the "North Pier." These, or some of them, are sometimes spoken of as the "Outer Pier." The usual method of bringing a tow such as accompanied the Maine within this outer breakwater or pier is to break up the tow, and cause each one to be taken in by a tug, and thence on up the river to its own dock. It appears that vessels

frequently anchor in the vicinity of the place where these vessels were located at about 2:30 p. m. July 24th, waiting for tugs. In the case at bar the task of the propeller was at an end. It remained only to tow the cargoes by means of tugs to their several docks. There are various book definitions of the word "port." In the nature of the case, they cannot be more definite than the statute. What constitutes a port for the purposes of the revenue act must of necessity be a matter of proof in each case. That the word is broader than the word "harbor" is apparent. That it may mean more in one connection than in another would seem to be probable. In Ayers v. Thacker, 3 Mason, 155, Fed. Cas. No. 684, Justice Story says, "In our revenue laws, 'port' and 'district' are often used as of the same import in cases where the limits of the port and district are the same." It may well be that a place where cargoes are taken or discharged should be more circumscribed than a place within which duties are collected. Hunter v. Ins. Co., L. R. 13 Appeal Cases, 724; In re Wharf Case, 3 Bland, 369. In commerce there must be an actual bringing of the vessel and its cargoes into contact, with facilities required for its further advance along commercial lines. "Port," as used in the revenue act, rests somewhat in theory, and involves intention (see Waring v. The Mayor, 8 Wall. 110, 19 L. Ed. 342, where "intent" is considered), and perhaps subsequent acts, to make its operation effectual. The language of the statute is that it may include places where cargoes are received and discharged, thus indicating a distinction between a commercial and a fiscal port. It cannot be the intention of the law that a vessel must report at the barge office before it can be considered in port, since there are several piers or docks between that office and the mouth of the river. It seems to me clear that the four vessels were in Chicago, at Chicago, and in port, for the purposes of the Dingley act, at the time it went into effect. This view is supported by the evidence of Capt. Keith and other lake and river navigators. · If this be so, did the acts of Hartwell Lumber Company in the premises amount to a compliance with the law as to a tender of entry? The Hartwell Company, by its agent, began making tender of entry on the day before the vessels arrived in port, asserting that they were in American waters at that time. This tender was kept up until about noon of the day on which the vessels arrived in port. This tender the customs officials rejected on the ground that the vessels had not reported at the customhouse. It is fair to assume, for the purposes of tender, that this was such a refusal to permit entry to be made as justified the agent of the Hartwell Lumber Company in considering all attempt to make the tender until the vessels had reported useless. It does appear that he was at the collector's office until 4 o'clock, looking after the matter, and could have tendered entry after the vessels had arrived, and before 3:06 p. m., had he not accepted the dictum of the custom officials as final.

The only remaining question is whether, having failed to tender entry within that half hour, the Dingley law took effect as to the importation. Tariff Act July 27, 1897, c. 11, § 33, 30 Stat. 213 [U. S. Comp. St. 1901, p. 1701], provides that, "on and after the day when this act shall go into effect, all goods, wares and merchandise previously imported for which no entry has been made * * * shall be subjected to

the duties imposed by this act, and to no other duty, upon the entry or the withdrawal thereof." Section 2774 of the Revised Statutes [U. S. Comp. St. 1901, p. 1862] provides that the master of a vessel shall report to the chief officer (customs) the arrival of his vessel within 24 hours after arrival, if the hours of business permit, or as soon there-after as such hours permit. Section 2785 [U. S. Comp. St. 1901, p. 1867] allows the owner or consignee of merchandise to make entry of the merchandise within 15 days after the report of the master to the col-lector. A fair construction of section 33 makes it apply only to impor-tation made prior to July 24. To hold otherwise would practically be deciding that no importations could be made under the 1894 act on the day the new act took effect, even though they arrived at the port previ-ous to the hour when the act became a law, since the law might have become effectual after the customhouse had closed, while yet there was plenty of time to have tendered entry and reported the vessel. The mere closing of the customhouse would not affect the right of en-try. Neither can the refusal of the customs officers to receive tender of entry affect the importer's right to tender entry. Campbell v. U. S., 107 U. S. 407, 27 L. Ed. 592; United States v. Legg, 105 Fed. 930, 45 C. C. A. 134. If, however, the tender of the entry was not extended to 3:06 o'clock by the refusal of collector as aforesaid, yet, if the ves-sels were actually in port, why were the owners not entitled to the 15 days provided by section 2785? In either case the Hartwell Lumber Company has complied with the law, and is entitled to enter the lumber cargo under the act of 1894. The same ruling is made with reference to the appeal of the Spry Lumber Company in the case of The Exile.

The claim made in cases of the Toltec, a propeller, and her tow, the barge Miztec, cannot be sustained. These two were loaded with lum-ber imported from Canada, and consigned to the Spry Lumber Com-pany. From the record, it appears they were within the collection dis-trict, but not within the port. It is held in U. S. v. Vowell, 5 Cranch, 368, 3 L. Ed. 128, and Arnold v. U. S., 9 Cranch, 104, 3 L. Ed. 671, and U. S. v. Legg, supra, that there would be an arrival within some port of entry, in order to constitute an importation. It is insisted that an arrival within the collection district and the tender of entry, combined, take the present case out of the rule. With this contention I do not agree. If such acts as amounted to tender of entry were not at the time an obligation, the attempt at tender cannot make them so.

The finding of the Board of General Appraisers with regard to the Maine, the Pendell, and Buckhout is reversed, and it is ordered that the Hartwell Lumber Company have and recover from the collector the sum of money so by him collected from it. See section 989, Rev. St. [U. S. Comp. St. 1901, p. 708]. The same order will be entered in the case of the barge Exile in favor of the Spry Lumber Company. The appeal of the Spry Lumber Company with reference to the pro-peller Toltec and the barge Miztec is dismissed.