## THE PRZEMYSL.

District Court, E. D. Louisiana. December 30, 1927.

Nos. 18953, 18954.

1. Customs duties ⊕═133(4)—Internal revenue ⊕═46—Owner and charterer of vessel and owner of cargo held entitled to defend libel for forfeiture under tariff and internal revenue laws, where ship's officers delivered ship to government officers (Tariff Act 1922, § 1, Schedule 8, par. 813; § 584 [19 USCA §§ 121, 486; 26 USCA §§ 1181, 1182]).

In libel by United States, praying forfeiture of vessel under Tariff Act 1922, § 584 (19 USCA § 486), and Rev. St. § 3450 (26 USCA §§ 1181, 1182 [Comp. St. § 6352]), and of cargo of alcohol and liquor under Tariff Act 1922, § 1, Schedule 8, par. 813 (19 USCA § 121 [Comp. St. § 5841a]), in which it was shown that officers of vessel disobeyed instructions as to

destination and delivered vessel into hands of government officers, claimants of ship and cargo, who were owner and charterer of vessel and owner of cargo, *held* to have right to appear, make claim, and defend suit.

2. Customs duties ⊕═121—Customs revenue statutes, penalizing certain offenses, should be strictly construed.

Customs revenue statutes, penalizing certain acts defined as offenses by fines, penalties, and forfeitures, enforcible in civil suits, *held* quasi criminal in character, and are to be strictly construed.

3. Customs duties ⊕═122—Intent to defraud revenue is essential to "smuggling," within customs revenue statutes.

Under customs revenue statutes, "smuggling" of foreign goods into this country must be considered with reference to place, circumstances, and intention with which goods were found at time of seizure; general test being whether or not there was intent to defraud revenue.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Smuggling.]

4. Customs duties ⊕═12—Legislative intent should not be defeated by strict adherence to letter of statute or interpretation leading to absurd consequences.

Legislative intent, clearly expressed in customs revenue statutes, should not be defeated by too rigid adherence to mere letter of statute, nor interpretation adopted which leads to absurd consequences.

5. Customs duties ⊕═130(6)—Internal revenue ⊕═46—Vessel carrying liquor, delivered to federal authorities by ship officers, cannot be forfeited under tariff or internal revenue laws, no intent to defraud United States being shown (Tariff Act 1922, §§ 584, 593 [19 USCA §§ 486, 496, 497]; 26 USCA §§ 1181, 1182; Revenue Act 1926, § 900 [26 USCA § 245]).

Motor schooner carrying liquor, delivered to federal authorities by ship officers, who had disobeyed instructions as to destination, *held* not liable to forfeiture under Tariff Act 1922, § 584 (19 USCA § 486 [Comp. St. § 5841h3]) or Rev. St. § 3450 (26 USCA §§ 1181, 1182 [Comp. St. § 6352]), as affected by Revenue Act 1926, § 900 (26 USCA § 245), which amended Revenue Act 1918, after having been seized for violation of Tariff Act 1922, § 593 (19 USCA §§ 496, 497 [Comp. St. §§ 5841h12, 5841h13]), since intent to defraud government of tax, which is essential under each of such statutes, was not present.

6. Internal revenue ⊕═12—Statutory tax on distilled spirits held effective only after "importation" (26 USCA §§ 1181, 1182; Revenue Act 1926, § 900 [26 USCA § 245]).

Rev. St. § 3450 (26 USCA §§ 1181, 1182 [Comp. St. § 6352]), as supplemented by Revenue Act 1926, § 900 (26 USCA § 245), which amended Revenue Act 1918, and prescribed tax on distilled spirits, provided for tax only after "importation" into United States, which could not happen until importation was made complete by bringing of commodity through lines

of customs authorities, or at least within port of entry.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Import—Importation.]

**7. Customs duties ⟨⟩130(11)—Cargo of liquor, delivered to federal authorities before reaching port of entry, cannot be forfeited under statute prohibiting importation of liquor without permit (Tariff Act 1922, § 1, Schedule 8, par. 813 [19 USCA § 121]).**

Where motor schooner and cargo of alcohol and liquor, before being brought into port of entry, was delivered to federal authorities by ship officers, who had violated instructions as to destination, cargo cannot be forfeited, under Tariff Act 1922, § 1, Schedule 8, par. 813 (19 USCA § 121 [Comp. St. § 5841a]), prohibiting importation of liquor without permit.

In Admiralty. Libels by the United States against the motor schooner Przemysl, her engines, boats, tackle, etc., wherein J. La Salle and the Southern Freighters Limited, were claimants, and against the cargo of wines, etc., on board said schooner, claimed by George John Jonas, praying forfeiture of vessel and cargo. Libels dismissed, and decree entered for respondents.

Wayne G. Borah, U. S. Atty., of New Orleans, La., A. W. Henderson, Sp. Asst. Atty. Gen., and T. M. Logan Bruns, Asst. U. S. Atty., both of New Orleans, La.

Hugh S. Suthon and Jos. A. McCaleb, both of New Orleans, La., for Southern Freighters, Limited.

BURNS, District Judge. By two libels of information the government prays for the forfeiture of the steel auxiliary vessel Przemysl and its cargo of alcohol and liquor. The libel against the vessel charges an alleged violation of section 584 of the Tariff Act of 1922 (42 Stat. 858, 980, 19 USCA § 486 [Comp. St. § 5841h3]), because of its alleged failure to produce the manifest required of vessels bound for the United States, and also an alleged violation of section 3450, R. S. (26 USCA §§ 1181, 1182 [Comp. St. § 6352]), because of the alleged deposit and concealment on board of a commodity in respect whereof certain taxes are imposed by law and on which no tax had been paid.

The libel against the cargo charges an alleged violation of paragraph 813 of Schedule 8 of the Tariff Act of 1922 (19 USCA § 121 [Comp. St. § 5841a]), supra, by its being brought into the United States without a permit from the Commissioner of Internal Revenue.

Claims were filed by Joseph La Salle, of Hamburg, Germany, as owner of the vessel;

23 F.(2d)—22

by Southern Freighters, Limited, a corporation of Vancouver, British Columbia, Canada, as charterer of the vessel; and by George John Jonas as owner of the cargo under a bill of lading in his name. These were followed by the filing of answers to the libels, setting up at length that the seizure of the vessel and cargo by the United States Coast Guard at a point one-half mile inside South West Pass of the Mississippi river was illegal; that the captain and first mate of the vessel had, by collusion with the United States consul at Hamburg, Germany, and with two certain federal prohibition agents at or near the Panama Canal Zone, delivered the vessel to the federal authorities at the place of alleged seizure, after they had stolen or embezzled the same from its owners in Hamburg, Germany, and diverted it from its course; that this had been done under the pretext of accepting employment from the owners to operate and navigate the vessel.

Exceptive allegations were then filed on behalf of the government, denying the ownership of claimants and their right to appear, defend, and stand in judgment, alleging the true ownership to be vested in one Anthony Strallo, otherwise known as Tony Cornero, an American lately resident of Los Angeles, Cal., where, previously, he had been convicted of violations of the National Prohibition Act (27 USCA). These exceptions were sustained in a hearing in limine litis, compelling the respondents to file evidence to sustain their allegation of ownership of the vessel. Documents were then filed, showing the record ownership in the name of Joseph La Salle, also the German registry of the vessel, showing her home port in Hamburg, and the chartering of the vessel to the respondent claimant, Southern Freighters, Limited, whereupon the issues were referred to the merits, and the case proceeded to a full hearing in open court.

I find from the evidence that the Southern Freighters, Limited, is composed principally of Anthony Strallo, alias Tony Cornero, and the several members of a Canadian law firm, including claimant George John Jonas, with offices in Vancouver, British Columbia; that the vessel was chartered to this corporation after it had been acquired by or in the name of Joseph La Salle, of Hamburg, Germany; that it was acquired first, conditionally, by an agreement of sale, dated July 13, 1927, at Rotterdam, Holland, under the name Delfzyl, from H. E. Oving, Jr.'s Yser-en Staalhandel, Naamlooze Vermootschap, of Rotterdam, Holland, by Joseph La Salle of Hamburg,

Germany, pursuant to which agreement it was sold to him by formal bill of sale on August 9, 1927; that the vessel was then manned with a partial crew in charge of Capt. Thode, of Hamburg, Germany, and moved to that port, where the ownership was recorded in La Salle's name and her name changed to Przemysl, and her home port changed to Hamburg, under German registry; that the cargo was bought of Hugo Peters & Co. and loaded aboard the vessel at that company's wharf in Hamburg, whence she cleared with the cargo duly manifested for Vancouver, British Columbia, Dominion of Canada; that a bill of lading corresponding to the cargo and its manifest was signed by the master of the vessel, Capt. Thode, and issued to John Jonas, Vancouver, B. C., who is the same person whose full name is George John Jonas, and who appeared in person in court; that Anthony Strallo was personally present in Hamburg, Germany, where he acted somewhat as shore agent or ship's husband, both in his own interest and that of these respondents, their several interests being undetermined; that while there he cashed American Express Company checks on or about August 8, 1927, for large sums of money; that he, together with Joseph La Salle, hired or arranged for the hiring of Capt. Thode as master of the ship and of First Mate Petersen, as well as of the balance of the crew, consisting of some 13 men, who were all advanced some two months' wages by Strallo and La Salle; that, whereas, the ship was cleared and manifested for Vancouver, British Columbia, it is doubtful if that port was intended as the destination of the cargo.

Capt. Thode and First Mate Petersen testified that Strallo gave them specific instructions for stopping the ship alternately at four points, two of which were off the coast of northwest Mexico, well out on the high seas, and two farther out on the high seas and beyond the territorial jurisdiction of the United States or the four-league limit off the southwest coast of California, where they were to recognize Strallo or his brothers and other agents, who would meet them at sea on board other vessels, there to be recognized by their coming astern of the Przemysl and signaling with handkerchiefs in a certain manner; that these stops were to have been made on the high seas alternatively at these four points going in a northwesterly direction, stopping seven days at each point, during which time they were to wait for the arrival of Strallo, or those authorized by Strallo to receive the cargo of liquor. Considering the

character of these witnesses and their interest in the outcome of this suit, I am not much inclined to believe their testimony.

Whether the cargo was really destined for Vancouver, or for sale or delivery on the high seas, or even for ultimate actual smuggling directly into the United States, as stated by Thode and Petersen, such original plans and intentions on the part of the owners were defeated by the supervening intention of this Capt. Thode and First Mate Petersen, who before leaving Hamburg executed an independent intention and purpose adopted by them during the two or three days preceding the clearing of the vessel from Hamburg, and in anticipation of the vessel passing into their actual physical possession and control upon leaving the docks of Hugo Peters with the cargo.

As hereinbefore stated, Capt. Thode had been engaged as master by Strallo and La Salle, and took the vessel from Holland to Hamburg with a partial crew; at Hamburg, Strallo and Thode engaged Petersen as first mate and supercargo, and otherwise filled out the crew of 13 men. This Petersen had previously been in the liquor business, and on one occasion, at least, according to his own testimony, had accompanied a cargo of liquor, sold by him, until it was smuggled into the United States, where he collected the price and returned to Germany. It was he who, also upon his own testimony, shipped as mate and supercargo in order to execute his own preconceived plan to engage in barratry; i. e., to embezzle a ship and cargo of liquor and turn the same over to the United States government, which by its custom revenue laws provides for a statutory reward to informers who furnish information or assistance in the discovery of frauds upon the revenue. Recognizing the necessity for co-operation by the master, he disclosed his purpose to Capt. Thode, who adopted it and confederated and agreed with him to perpetrate this fraud upon the owners, who had hired them. Thereupon, with Thode's sanction and agreement to help execute the scheme, and without the knowledge of La Salle or Strallo, or these other claimants, Petersen repaired to the American consulate in Hamburg, in order to pave the way for his safe entry into the United States, and to lay a foundation for his claim of a reward in the United States when he should arrive there.

The American consul gave Petersen a signed copy of a letter on an American consulate letterhead, dated Hamburg, Germany, August 27, 1927, reading as follows:

"United States Prohibition Officer of the Panama Canal Zone—Sir: This letter will serve to introduce Capt. Christian Petersen, supercargo on the German motorschooner Przemysl, as well as the captain of the said vessel, who are desirous of discussing with you certain plans for turning the schooner and cargo over to the American prohibition authorities of Southern California, as the vessel has been chartered for the purpose of smuggling a large quantity of spirits into Southern California, according to the manifest which the captain will be pleased to place at your disposal. The captain and supercargo would like some assurances as to the reward they will receive from the government for turning over the valuable vessel and cargo to the prohibition authorities. I am, sir, very respectfully yours, [signed] Thos. H. Bevan, American Consul."

The ship then left Hamburg, Germany, in charge of Capt. Thode as master and First Mate and Supercargo Petersen, ostensibly operated and controlled by them in these capacities for account of the owners, but in fact for their own account, and with no intention on their part whatever to recognize either the authority of the owners over their lawful property, for such it was at that time and place, nor to use in a lawful manner the ship's papers for a voyage to Vancouver, British Columbia, or to any place on the high seas, either lawful or unlawful, as intended by the owners. They pursued the usual navigation course across the Atlantic; the ship being slow and not making more than five knots. Coming to the Canal Zone, Capt. Thode and Petersen went ashore to Colon and Cristobal, where they sought through the Canal Zone police some United States officer with whom they might conclude their arrangements. They finally met two federal prohibition agents, who had been specially detailed from California to the Canal Zone, equipped with a copy of the American consul's letter, a duplicate of that held by Petersen, by means of which they identified themselves to Thode and Petersen. Meanwhile the latter telegraphed one Murdock in Vancouver, British Columbia, at the office of Southern Freighters, Limited; this name and address having been furnished him, according to his testimony, by Strallo, the said Murdock being a stockholder in said company, as follows:

"Colon, October 12, 1927.

"Safely arrived in Colon Need another thousand dollars speedily for several repairs and requirements Send money to Chase National Bank Cristobal Canal Zone.

"Thode."

This money was telegraphed them, and they admit it was obtained on false pretenses, and that they bought provisions amounting to little more than $100 and converted the balance to their own use. Again on October 15, from Colon, they telegraphed the same Murdock in Vancouver: "O. K. Leaving Panama tonight. Thode"—thus falsely pretending an intention to pass west through the Canal via Panama City to the Pacific Ocean that day, and misleading the owner or agent in Vancouver to believe that they were acting in good faith.

They did actually leave Colon that day, bound for New Orleans, after conference with the two United States prohibition agents, who gave them the following letter:

"Cristobal, Canal Zone, October 15, 1927. Captain H. Thode, Christian Petersen: The undersigned, special agents of the Bureau of Prohibition, government of the United States, do hereby state that, on October 12, 1927, Capt. H. Thode and Christian Petersen voluntarily communicated with and made themselves known to us as master and supercargo of the motorship Przemysl, advising that they had arrived at this port that date in command of said ship which carried a cargo of liquor, and did thereupon state that it was their desire and did voluntarily propose, of their own free will and accord, to surrender the ship together with its entire cargo as manifested, to the government of the United States. The said Thode and Petersen have further stated that it is their desire and intention to surrender the above named ship and cargo at the Port of New Orleans, Louisiana, and that they will proceed this date to that port, where, upon arrival, they will duly surrender said ship and cargo to officials of the United States Treasury. [Signed] W. E. Dresser, Special Agent. Geo. H. Hurlburt."

Meanwhile the two federal prohibition agents, Dresser and Hurlburt, who knew how slow the Przemysl sailed, came by steamer to the United States, passed through New Orleans, went to Washington, D. C., reported to various officials of the Treasury Department, returned to New Orleans, where they also reported to the local prohibition and customs officials, proceeding thence down the river on a Coast Guard vessel to meet the Przemysl when she should arrive. The Przemysl did not reach South West Pass of the Mississippi river until shortly after midnight of October 28, where, before entering the pass, she signalled by flare and rocket for a bar pilot, who went aboard, taking command of the wheel in the usual course. He brought her into the pass over the bar, whilst one of the other

bar pilots on that station went to the United States Coast Guard vessel, awakened the boatswain in charge, and advised him that the vessel he was waiting for had arrived. This boatswain of the Coast Guard vessel thereupon went aboard of and "seized" the Przemysl, or rather accepted delivery thereof, within a half mile of the jetty light and entrance, thereafter towing the vessel up through the pass and river to New Orleans, being first joined by three other United States Coast Guard vessels, aboard one of which were the same two prohibition agents who had certified the purpose and intention of Thode and Petersen by the above letter.

The Przemysl was thus brought a distance of approximately 100 miles up the pass and river, and across the boundary of the port of entry, which extends only some 8 miles below New Orleans, where the collector of customs made formal seizure, following an appraisement of the cargo, totaling $670,029.05. This notice of seizure, dated November 3, 1927, was served on "Henry Thode, master." It recites:

"The seizure was made at ½ mile inside east jetty of S. W. Pass, Mississippi river, under the following circumstances: [Description of cargo and appraisement omitted.] Seizure made at 1:20 a. m., October 29, 1927. This vessel was seized one-half mile inside of east jetty light of Southwest Pass, while proceeding up the channel in charge of Pilot Redman. Vessel was stopped and boarded by the officer in charge of U. S. C. G. No. 300. Upon investigation of cargo and no satisfactory reasons given by master of vessel for his being in the channel, the vessel was seized and towed to New Orleans by the C. G. No. 300, No. 177 and C. G. 225. Violation of section 593 and paragraph 813, Tariff Act of 1922."

[1] Under this state of facts I have concluded that the claimants of the ship and cargo have shown a prima facie and unrebutted right to appear, make claim, and defend this suit. The ship's status, in this case, does not depend upon a mere presumption arising from the flag she flew. Her registry, together with the muniments of title and other ship's papers in the record, shows that the claimants have a standing in court, with a right to defend their possession of the property and stand in judgment; that it is not necessary to determine the respective rights of these individuals and the corporation charterer as between themselves; that they are not all necessary parties to this proceeding; that it is not necessary to decide more upon this phase of the case; that the libel-

ant has no interest beyond the forfeiture of the res under seizure; and that this forfeiture depends entirely upon proof of the specific charges made in the libel.

[2] Numerous authorities have been cited on both sides dealing with the customs revenue statutes, which all recognize that the successful administration of the revenue laws would be frustrated unless the pains and penalties made applicable by statute to prohibit smuggling and frauds on the revenue generally are strictly enforced. Yet it is equally well recognized that the Congress has meticulously detailed and penalized numerous acts antecedent to actual smuggling and to the actual introduction of goods into the United States, and has classified them into many distinct offenses according to their gravity, imposing different penalties in one case than in another.

[3, 4] It has also been recognized that whilst many such acts, defined as offenses, are penalized by fines, penalties, and forfeitures enforceable in civil suits, these are none the less quasi criminal in character, and, notwithstanding the necessity for protecting the revenue of the sovereign, such statutes cannot be loosely construed, but are rather to be strictly construed, as are criminal statutes generally. These same authorities recognize that the terms "smuggling," or the "importation of, or the introduction of, foreign goods" into the country, must be considered with reference to the place at which, the circumstances under which, and the intention with which, the goods were found at the time of seizure; the general test being whether or not there is an intent to defraud the revenue. The legislative intent, clearly expressed, should not be defeated by a too rigid adherence to the mere letter of the statute, nor an interpretation adopted which leads to absurd consequences. Oates v. First National Bank, 100 U. S. 239, 25 L. Ed. 580.

[5] With these general principles in mind, I have considered the fact that the circumstances peculiar to this case prompted the prohibition enforcement officers, who were directly concerned with the case originally on this side of the Atlantic, and were in some measure responsible for its occurrence, not to charge or attempt to charge and prosecute the master and mate of the ship for transporting liquor within the territorial jurisdiction of this court, in violation of the National Prohibition Act, under which proceeding a forfeiture of the vessel and the liquor might follow upon their conviction, and whereby a more liberal interpretation might be given the words "importation of," as the

Supreme Court plainly indicated in Cunard S. S. Co. v. Mellon, 262 U. S. 100, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306. It is also noticed that the seizure was actually made by the collector of customs for an alleged violation of section 593 of the Tariff Act of 1922 (19 USCA §§ 496, 497 [Comp. St. §§ 5841h12, 5841h13]), which penalizes smuggling and clandestine importations, when knowingly and willfully made with intent to defraud the revenue of the United States, as an offense; whereas, the district attorney abandoned this cause of seizure and elected to proceed under section 584, on the ground that the seizing officer "made lawful demand upon the master of said vessel to produce a manifest," and "that the master of said vessel did not produce a lawful manifest."

The explanation in the government's brief is "that the government considered it would be fairer to all parties interested to proceed under the custom laws, in order that the interest of all parties might be lawfully and regularly adjudicated." Perhaps this means that the action of the American consul at Hamburg and of the prohibition agents at Colon and here encouraged the captain and mate in their enterprise, and made too evident the actual intention of these two men, as well as their doubtful authorization of the transportation which ensued. It may also mean that they did not wish to jeopardize the collection of the reward they hoped for, notwithstanding at the same time that the owners might be precluded from claiming restitution in the manner provided for by section 26, title 2, of the National Prohibition Act (27 USCA § 40).

In my view there is no essential difference between section 584 and section 593 in respect to the element of intention on the part of the master of any vessel sought to be held under the statute, because, while section 593 incorporates the phrase "with intent to defraud the revenue of the United States" in the opening clause, section 584, in its concluding clause, no less plainly contemplates intent as an ingredient of the offense. It provides specifically: "That if the collector shall be satisfied that the manifest was lost or mislaid without intentional fraud, or was defaced by accident, or is incorrect by reason of clerical error or" by reason of "other mistake, and that no part of the merchandise not found on board was unshipped or discharged except as specified in the report of the master, said penalty shall not be incurred."

By this provision Congress plainly contemplated that all of the surrounding circumstances should be considered, to determine whether or not there was an intention to defraud the revenue. The evidence satisfies me that the collector, being fully apprized in advance of all the facts relating to the vessel, cargo, and manifest, and before the same was tendered him, under the circumstances recited, and upon finding that the cargo corresponded exactly with the manifest declaring the vessel for destination at Vancouver, British Columbia, and knowing that the vessel itself had not been intended originally by the owners for destination in the United States, he concluded that his right to a forfeiture did not arise under that section, and therefore he chose section 593.

However, the prosecuting officer elected, as stated, to proceed under section 584, and then additionally charged a violation of section 3450, R. S. This statute, standing alone, as originally enacted, and until the passage of the Revenue Act of 1926 (44 Stat. 104), contemplated an internal revenue tax upon wines, spirits, and other liquors, and commodities manufactured or produced within the territorial limits of the United States and its possessions; but Revenue Act of 1926, § 900 (26 USCA § 245) amends the Revenue Act of 1918 by prescribing the levy and collection of a tax "on all distilled spirits now in bond or that have been or that may be hereafter produced in or imported into the United States, in lieu of the Internal Revenue taxes now imposed thereon by law, an Internal Revenue tax, at the following rates, to be paid by the distiller or importer when withdrawn. * * *" The libel of information for that reason pleads the application of section 3450, R. S., as supplemented by this new cognate section of the Revenue Act, so that the forfeiture prescribed by 3450 might accrue where foreign commodities subject to that tax are deposited or concealed after importation with the intent to defraud the United States of such tax.

Here again appears the utter absence of the necessary intent to defraud the United States of a tax on the part of those in charge of the liquor at the time of its seizure. The circumstances under which the Przemysl left, the intermediate stop at Canal Zone, and the conjoint action taken by the master in charge of the vessel and the prohibition agents, whom he again met at New Orleans for the purpose of tendering them the vessel, all preclude the possibility of any intention to conceal and thereby to defraud the government of any tax upon this cargo, which is conced-

ed to have been received into the hands of the government officers intact as to quantity and content just as it left Hamburg.

[6] Moreover, this tax could only be levied and collected, under the terms of the statute, after importation into the United States. This could not have happened until the importation was made complete by the bringing of the commodity through the lines of the customs authorities or at least within the port of entry. Under the facts here found, the commodity was received from the persons in control into the hands of the revenue Coast Guard acting in co-operation with the revenue agents and customs inspectors, and it was these very taxing agencies that brought the commodity upon which a tax might be imposed through their own lines; so that neither the intention nor the condition upon which a right to forfeiture might arise existed. Mata v. United States (C. C. A.) 19 F.(2d) 484, 486; American Banana Co. v. United Fruit Co., 213 U. S. 347, 29 S. Ct. 511, 53 L. Ed. 826, 16 Ann. Cas. 1047; U. S. v. 2,180 Cases of Champagne (C. C. A.) 9 F.(2d) 710, 713; U. S. v. 350 Chests of Tea, 12 Wheat. 486, 492, 6 L. Ed. 702.

[7] The second libel for the forfeiture of the cargo is in no better case. It is predicated on paragraph 813 of Schedule 8 of the Tariff Act of 1922 (42 Stat. 898), which is preceded by some 12 paragraphs prescribing custom duties additional to internal revenue taxes upon distilled spirits, wines, liquors, etc., imported into the United States, and it reads:

"No wines, spirits, or other liquors or articles provided for in this schedule, containing one-half of one percentum or more of alcohol shall be imported or permitted entry except on a permit issued therefor by the Commissioner of Internal Revenue, and any such wines, spirits, or other liquors or articles imported or brought into the United States without a permit shall be seized and forfeited in the same manner as for other violations of the customs laws."

It is apparent that the prohibition of the Eighteenth Amendment prompted the insertion of this paragraph, to enable the Commissioner to regulate such importations of liquor as are recognized as the lawful subject of importation and taxation. It is subject to the internal and customs revenue tax, which is levied and collected and the permit of the Commissioner obtained at the custom line, and both the collector and the Commissioner must function then as a condition of its entry and importation. Such intent to import or to enter without a permit and

without tax payment cannot become manifest until such liquors or commodities come not alone within the territorial limits of the United States, or within the customs district, but until the commodity shall have passed into the port of entry. So, too, before it can be forfeited, it must have passed through the lines of the custom authorities, because there cannot be an eccentric definition of the terms "importation" or "brought into" appearing in a customs statute. Cases cited, supra.

For the purpose of these customs revenue laws, the term "importation" must be taken as one to which the government's right to duty attaches at the earliest upon an arrival within the limits of a port of entry; the importation being complete only when the taxable, dutiable commodity is brought there, with the intention of unlading them there for fusion with the commerce of the country.

The absence of a permit by the Commissioner of Internal Revenue could not have operated a forfeiture until the goods had actually been imported or brought within the port of entry, or were entered without a permit, just as in the case of the cognate customs statutes. This is further illustrated by the concluding provision that such, etc., "imported or brought into the United States without a permit shall be seized and forfeited in the same manner as for other violations of the customs laws." Moreover, this seizure was made in the manner heretofore stated, and the liquor and spirits came into the possession of the government before the permit could have been required, and before it was brought into the port of entry, and this bringing was done by the customs officers themselves.

By analogy this view is supported by what the Supreme Court held in construing the term "importation" as used in the National Prohibition Act in its relation to the Eighteenth Amendment, because there it was held that the more technical meaning of the word, customarily adopted in construing customs revenue laws, could not be followed. The chief distinction made was that in the Prohibition Act an entry through a custom house is not of the essence of the act of importation. Cunard S. S. Co. v. Mellon, 262 U. S. 100, 120, 121, 122, 43 S. Ct. 504, 67 L. Ed. 894, 27 A. L. R. 1306. This was no more than a recognition of the settled definition in the construction of customs revenue laws. See, also, Seijo v. U. S. (C. C. A.) 20 F. (2d) 904; Ritterman v. U. S. (C. C. A.) 12 F.(2d) 849; The Homestead (D. C.) 7 F. (2d) 413; United States v. Vowell, 5

Cranch, 368, 3 L. Ed. 128; Arnold v. U. S., 9 Cranch, 104, 3 L. Ed. 671; Keck v. U. S., 172 U. S. 434, 19 S. Ct. 254, 43 L. Ed. 505; and Rose's notes thereon.

My conclusion that the libels should be dismissed may safely rest upon the foregoing considerations, though I can readily conceive further support that could be drawn from the legal effect of the acts of the government officials concerned, which were contrary to public policy. These were touched no further than to emphasize the doubt and uncertainty indicated by the collector of customs and the prosecuting attorneys as to the application of any statute to these facts. So, too, the letters of the consul and prohibition agents were quoted and referred to merely to remove any doubt of the intention actually coupled with the act of the captain and mate, because it is this actual intention of these two men that forms the very crux of the case. Having abandoned the conjoint original intention they held with the owners to smuggle the liquor into the United States, or otherwise dispose of it in a joint undertaking with them, they left Hamburg pursuant to their own independent intention to foist the ship and cargo upon the United States government under false pretenses and as a pretext for claiming a reward. I say false pretense, because the moment they decided to practice or commit barratry, any intention of the owners depended for execution thereafter on their ability to execute through other agents and to repossess control of the ship and cargo.

It should not be necessary for the courts of justice to directly interpose their power to maintain the dignity of and the respect due abroad to the government and the majesty of its laws. It should not happen that subordinate executive officers be sustained by the courts in the errors they make in mistaken zeal for the enforcement of purely domestic police measures. Such irregularities can only result in embarrassment to the government and the responsible heads of its departments. It seems not to have occurred to the consul at Hamburg, as a government representative, functioning within the jurisdiction of a friendly nation, that he might have advised his home government of facts coming into his knowledge threatening its peace and dignity, without lending aid and encouragement to questionable characters, the execution of whose declared barratrous purpose could not begin, except by a breach of that country's laws by an unlawful conversion of property there recognized as lawful. The prohibition agents of the California district, who met the vessel at Colon, Panama, and lent their aid and encouragement with prior knowledge of all the facts and the intention of the captain and mate, likewise seemed not to realize that the nefarious scheme of these two men could culminate only in their making of false and fraudulent claims against the government for a reward, in abuse of a statute designed by the government for the salutary purpose of protecting its revenue.

Accordingly, the libels of information in both cases will be dismissed, and a decree entered in favor of respondents, as by them prayed for, with costs.