(C. D. 1137)

THE SHERWIN-WILLIAMS CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided November 17, 1948)

*Lamb & Lerch* (*John G. Lerch* and *David A. Golden* of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (Howard L. Harawitz, special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

CLINE, Judge: This is a protest, arising at the port of Cleveland, against the collector's assessment of duty on merchandise, consisting

of flaxseed and screenings, at the rate of 32½ cents per bushel of 56 pounds on the flaxseed content under paragraph 762 of the Tariff Act of 1930, as modified by the trade agreement with Argentina (T. D. 50504) and the trade agreement with Uruguay (T. D. 50786), and at the rate of 5 per centum ad valorem on the screenings under paragraph 731, as modified by the trade agreement with Canada (T. D. 49752). Plaintiff claims that the flaxseed was entitled to free entry under the provisions of Public Law 211, approved December 22, 1943 (78th Congress, 1st session, 57 Stat. 607). At the trial, counsel for the importer stated that no issue was being raised as to the duty assessed on the screenings.

The pertinent provisions of the statutes and regulations are as follows:

PAR. 762 [as modified by the trade agreements with Argentina and Uruguay (T. D. 50504, T. D. 50786)]. Oil-bearing seeds and materials: Flaxseed ____ 50¢ per bu. of 56 lbs.

*Provided,* That on and after the effective date of this Agreement, and until the thirtieth day following a proclamation by the President of the United States of America, after consultation with the Argentine Government [the Government of the Oriental Republic of Uruguay], that the existing abnormal situation in respect of the trade in flaxseed has terminated, the rate of duty under this item shall be 32½¢ per bu. of 56 lbs.

[Public Law 211] *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That notwithstanding the provisions of the Tariff Act of 1930, the following, when imported into the United States from foreign countries, and when entered, or withdrawn from warehouse, for consumption, during the period of ninety days beginning with the day following the date of enactment of this joint resolution, to be used as, or as a constituent part of, feed for livestock and poultry, shall be exempt from duty: Wheat, oats, barley, rye, flax, cottonseed, corn, or hay, or products in chief value of one or more of the foregoing or derivatives thereof: *Provided,* That this Act shall not be construed to authorize the importation of wheat for milling purposes. * * *

SES. 2. The exemptions from duties provided for by this joint resolution shall be subject to compliance with regulations to be prescribed by the Secretary of the Treasury.

[Code of Federal Regulations, title 19, sec. 58 (T. D. 50983)] 58.1 *Free entry authorized.* Under the authority of sections 1 and 2 of Public Law 211, approved December 22, 1943, the following products, if entered, or withdrawn from warehouse, for consumption on or after December 23, 1943, and before March 22, 1944, and if actually used in the United States as, or as a constituent part of, feeds for livestock or poultry, are exempt from duty:

(1) Wheat, oats, barley, rye, flax, cottonseed, corn, or hay;

(2) Derivatives of the foregoing;

(3) Products wholly or in chief value of one or more of the products mentioned in (1) and (2) above.

The exemption does not apply to wheat or other grain which is used in the manufacture of flour for human consumption, to flaxseed or cottonseed for oil

milling, nor to other merchandise to be processed for the purpose of producing a product which is not to be used as, or as a constituent part of, feed for livestock or poultry. If the required use is shown, the exemption is applicable to imported derivatives of the products named in Public Law 211, such as feed flour, linseed cake or meal, and cottonseed cake or meal, and is applicable to products in chief value of one or more of the derivatives and/or the named products. (Public, No. 211, 78th Congress.)

58.2 *Entry requirements.* (a) There shall be filed in connection with the entry an affidavit of the importer that the merchandise, which shall be described by name, is imported to be used as, or as a constituent part of, feed for livestock or poultry.

(b) If the product is entered for consumption, there shall also be filed in connection with the entry a bond on customs Form 7551 or 7553, with an added condition, concurred in by the surety, for the payment of duty at the appropriate rate in the event that the proof of required use prescribed by section 58.3 is not produced within 1 year from the date of entry, or any lawful extension of that period. * * *

58.3 *Proof of use.* (a) Within 1 year from the date of entry (in the case of warehouse entries as well as consumption entries) the importer shall submit an affidavit of the superintendent or manager of the manufacturing plant stating the use to which the article has been put. * * *

(b) Upon satisfactory proof of use of the product as, or as a constituent part of, feed for livestock or poultry, the entry shall be liquidated free of duty. When such proof is not filed within 1 year from the date of entry or any authorized extension of the period of the bond, the entry shall be liquidated with the assessment of duty at the appropriate rate under the proper provision of the tariff act. (Public, No. 211, 78th Congress.)

Plaintiff contends that the imported merchandise, *flaxseed*, falls within the terms of Public Law 211, which lists *flax* as one of the articles to which the exemption applies; that the imported merchandise was used as, or as a constituent part of, feed for livestock or poultry; that the merchandise was withdrawn from warehouse during the effective period of Public Law 211; that the regulations were complied with.

Plaintiff called seven witnesses: Robert L. Rathbun, who had been connected with the linseed oil and flaxseed department of the plaintiff company for 13 years, during 8 of which he had been manager of the department and superintendent of the linseed oil mill; Arthur F. Schalk, a doctor of veterinary medicine, formerly with the United States Bureau of Animal Industry and the North Dakota State Agricultural College and at present head of the Department of Veterinary Preventive Medicine at Ohio State University; Ward J. Ramseyer, a general farmer and dairyman; S. J. Davidson, a feed, grain, and coal merchant; Harvey J. Amstutz, who has been in the grain and feed business and general elevator business for 17 years; Michael W. Pascal, a chemist, at present superintendent of the importer's linseed oil mill at Cleveland; Charles Frederick Monroe, who has been connected with the Ohio Agricultural Experiment Station since 1920.

Defendant called one witness, B. W. Fairbanks, formerly professor of animal husbandry at Colorado Agricultural College, formerly with the University of Illinois as head of the Swine Division, and at present Director of Research for the American Dry Milk Institute.

Mr. Rathbun testified that based upon his experience in selling cattle feed and as a farmer, the term "flax" meant flaxseed to him; Dr. Schalk testified that the term "flax" means flaxseed, as no other part of the plant is used for feed; Mr. Ramseyer stated that if some one tried to sell him flax, he would think flaxseed was meant; Mr. Amstutz, Mr. Pascal, and Dr. Fairbanks all testified that the term "flax" meant flaxseed to them.

During the course of the trial, counsel for the Government stated that two witnesses had testified that the term "flax" as used in the act was synonymous with flaxseed "and for present purposes I don't seriously dispute that, because the regulations issued under that act has [sic] used the word 'flaxseed'"; and that the merchandise herein was "flaxseed, and that is what Congress enumerated and that is what was imported."

Webster's New International Dictionary, 1948 edition, gives the following definition of "flax":

1. A plant of the genus *Linum*, esp. *L. usitatissimum*, the species commonly cultivated for its fiber. * * * The long silky bast fiber, freed from the stem by rotting or "retting" and various mechanical processes, is used in the manufacture of linen thread and twine, crash, and floor covering, esp. in the warp of wool carpets and rugs. See LINEN. The seed is also of great commercial importance. See FLAXSEED.

2. The cleaned fiber of the flax plant, prepared for spinning.

*       *       *       *       *       *       *

Since the purpose of Public Law 211 was to provide free entry for certain enumerated commodities when "used as, or as a constituent part of, feed for livestock and poultry," it is obvious that Congress must have meant "flaxseed" rather than "flax," as flax itself cannot be used for cattle feed.

Plaintiff contends further that Congress did not mean flaxseed as such, but flaxseed after processing, claiming that flaxseed as such could not be used as a feed for livestock or poultry.

Mr. Rathbun testified that when the instant merchandise arrived at The Sherwin-Williams Co. oil plant, the oil was extracted from the flaxseed and the meal obtained was shipped to their customers. Mr. Pascal described the process in more detail as follows:

The process to which this material was subjected was that the material was drawn into tanks into the plant, the material screened and the extraneous matter removed. The seed was then ground through rolls, placed into cookers, and cooked where heat and moisture is added, and then placed in a mold with a cloth around, and then placed in hydraulic pressures, and a pressure of four thousand pounds an inch is applied to remove the oil. The material then goes through a

trimming process where the oily edges are removed, and the cake sent to mills where it is ground, sacked, and placed in cars for shipment.

He stated also that the linseed cake or meal was sold to the customers listed in his affidavit (plaintiff's exhibit 2) and used by them as feed for livestock and poultry prior to June 20, 1944; that "The flax had been used and processed and the meal therefrom shipped to the feeder to feed to his livestock"; that the oil which had been extracted was used by Sherwin-Williams in the manufacture of paint or sold to others for such use. Mr. Rathbun testified that the company produces two major products from flaxseed—linseed oil and linseed oil-cake meal—and that one could not be produced economically without the other.

The record shows that flaxseed and linseed oil cake, also known as linseed oil meal and linseed oil-cake meal, are two different substances. The witnesses Schalk, Ramseyer, and Monroe testified that linseed oil cake is a residue of the flaxseed after the oil has been removed; Mr. Amstutz and Mr. Monroe stated that it is a derivative or byproduct of flaxseed; Dr. Fairbanks added that flaxseed is not a constituent part of linseed oil cake or meal, but that he "would say it the other way around."

There was considerable testimony on the question of whether or not flaxseed as such could be safely fed to livestock. Dr. Schalk testified that flaxseed in the raw state occasionally develops an intense poison, prussic acid, and that at times it requires but very little flax to produce enough prussic acid to cause death in livestock; that in the majority of the 20 years in which he lived in North Dakota, the presence of prussic acid in flaxseed was a problem. Mr. Pascal referred to an experiment in feeding whole and ground flaxseed to livestock made at Ohio State Experiment Station during the depression period and stated that one reason for its being unsuccessful was the danger of poison from the enzyme contained in flaxseed which produces prussic acid, and added that one of the problems in the production of oil meal and cake by The Sherwin-Williams Co. is to be sure that the material has been subjected to sufficient heat for a sufficient length of time to destroy the enzyme so that the cattle will not be poisoned. Mr. Monroe also stated that there was danger from prussic-acid poisoning in feeding flaxseed, as seed or ground, in a mixture for cattle.

These witnesses testified, however, that the enzyme which produces prussic acid may be removed by subjecting the flaxseed to a heat treatment for a sufficient length of time.

On the other hand, Dr. Fairbanks testified that prussic-acid poisoning occurs very rarely; that horses and swine are very, very rarely affected by prussic-acid poisoning; that cattle and sheep are affected more frequently but still very rarely; that glucose in an animal's digestive tract has a tendency to reduce the possibility of prussic acid

being poisonous; that in fattening animals, considerable starch and carbohydrates are used; that glucose is the end product of carbohydrate digestion; and that from a practical point of view in animal feeding, he could not subscribe to Dr. Schalk's opinion that the only safe way of using flaxseed is in the form of linseed oil meal.

Mr. Schalk testified that flaxseed even with the prussic acid removed could not be used safely as a cattle feed because it still contained oil. Mr. Monroe stated that flaxseed could not be used in a mixture for cattle both because of the danger of prussic-acid poisoning and of getting too much fat or oil into a dairy grain mixture, because the oil has a purgative action and if used in grain mixtures they are known to become rancid and unpalatable or soured. Mr. Pascal stated that from feeding and nutritional experiments it was found that the high degree or high concentration of fat contained in flaxseed interfered with the absorption of the protein value therein.

Several experiments carried on at the Ohio Agricultural Experiment Station and the Colorado Experiment Station were referred to by the witnesses and are described in defendant's exhibits 6, 7, and 8. In one experiment conducted at the Ohio Agricultural Experiment Station by Mr. Monroe and Mr. Thatcher, a mixture of peas, flax, and oats, resulting from growing these crops together, was fed to a group of cows as the complete grain ration. According to the published report (defendant's exhibit 6), the results indicated that the feeding value of the mixture was about equal to the check ration composed of corn, oats, wheat bran, and linseed meal, although the peas-flax-oats mixture was not as palatable. A similar experiment was carried on the following year and the report shows a like result except that the second mixture was apparently very palatable, perhaps due to a smaller percentage of weed seeds (defendant's exhibit 7).

Mr. Monroe testified that the purpose of these experiments was to try to grow a farm-grown mixture; that the feed containing flaxseed was equal in value to the feed containing linseed oil cake; that there were 8 animals in the first experiment and 16 in the second; that none died during the course of the experiments; that there was no case of prussic-acid poisoning; that all of the animals showed a gain in weight. However, Mr. Monroe did not believe that flaxseed as such was vindicated by the two experiments because the conditions were different from ordinary usage; that the mixture was fed in wintertime in small amounts and was fresh; that there is danger in using flaxseed both from prussic-acid poisoning and from getting too much fat or oil into the mixture.

Another experiment was conducted at the Colorado Experiment Station during 1931–32 under the direction of George E. Morton and B. W. Fairbanks for the purpose, according to Dr. Fairbanks, of

determining whether flaxseed could be used as a satisfactory protein supplement for fattening lambs. The report issued in connection therewith (defendant's exhibit 8) contains the following conclusion:

> Ground flaxseed may be added to the list of protein supplements available for Colorado lamb feeders. Its value depends upon its feed-replacement value and this in turn is influenced by the price of the feeds replaced.

Dr. Fairbanks stated that in the experiment, ground flaxseed which had not been subjected to any heat was used; that no ill effects or deaths from prussic-acid poisoning occurred; that there were no ill effects as a result of the oil content in the flaxseed. In his opinion, taking into consideration the practicability of feeding flaxseed, the probability of any dangers coming therefrom, flaxseed can be used as an ingredient in formulas for the feeding of livestock. He added that flaxseed and linseed oil meal are equal nutritionally as supplements to livestock feeds; that flaxseed serves as a source of protein and of energy or carbonaceous nutrient.

Dr. Fairbanks also referred to an experiment conducted at Wooster, Ohio, by Professor Robison, in which flaxseed was used as a feed for swine. He stated that in the report on that experiment the conclusion was drawn that flaxseed could be fed to swine as a source of protein and that gains were obtained a little more quickly with the flaxseed than with linseed meal.

Several of the witnesses testified that in their experience flaxseed is not fed to cattle. Mr. Rathbun stated that he had never fed it to his cattle and that he had never heard of its being fed. Mr. Ramseyer stated that he had never used flaxseed in the ground or crushed form in any formula or ration of livestock feed that he had given to his cattle; that he had never seen or heard of ground flaxseed being used; that he did not know of its being used as part of a feed consisting of other products. Mr. Davidson testified that he never sold flaxseed although he sold flaxseed meal quite extensively; that he had never seen flaxseed enumerated as one of the ingredients in any mixture which he sold. Mr. Amstutz stated that he had never sold flaxseed as such to farmers for cattle feed; that he had never been offered any ground flaxseed or crushed flaxseed for cattle feed; that he had never had any request from a dairy farmer for flaxseed for feed purposes, either whole, crushed, or ground.

On the other hand, Dr. Schalk testified that a small quantity of flaxseed without prussic acid could be used as an ingredient with other feeds to make a mixed feed for cattle. Dr. Fairbanks mentioned two products in the commercial field which contain flaxseed or ground flaxseed—Blatchford calf meal and another calf meal put out by Tryde & Co.

Dr. Fairbanks also testified that there is nothing nutritionally wrong with flaxseed and that it has not been used extensively in

recent years because the oil is too valuable for other purposes. Similarly, Mr. Pascal stated that flaxseed did not have sufficient feeding value for the *cost* compared to linseed oil-cake meal or other protein supplements.

Plaintiff contends that the evidence shows that flaxseed cannot be safely used as a feed for livestock or poultry; that Congress must have been aware of the danger of its use as feed at the time it enacted Public Law 211; that it must have meant to include in the duty-free provision, flaxseed from which the injurious properties—the enzyme which produces prussic acid and the linseed oil—had been removed. In other words, when Congress used the term "flax," it meant linseed oil-cake meal. While Congress undoubtedly meant "flaxseed" when it used the term "flax," as we have already pointed out, plaintiff's further contention is untenable.

The record does not establish conclusively that flaxseed, as such, can never be used as a feed for livestock. All of the witnesses agreed that the enzyme which produces the prussic acid can be destroyed by a heat treatment; flaxseed was used experimentally without any ill effects; the report of the Colorado Experiment Station stated unqualifiedly that ground flaxseed might be added to the list of protein supplements available for Colorado lamb feeders; it was used as an ingredient in two commercial calf meals. It cannot be presumed, therefore, that Congress must have known that flaxseed could *not* be used for feeding purposes.

The exemption in Public Law 211 is allowed to certain enumerated articles which are "to be used as, or as a constituent part of, feed for livestock and poultry." The flaxseed in the instant case was used in its imported condition to make two new products, linseed oil and linseed oil-cake meal, the latter alone being used as, or as a constituent part of, feed for livestock or poultry. The dutiable status of merchandise is ordinarily determined by its condition as imported (*United States* v. *Citroen*, 223 U. S. 407; *United States* v. *Lo Curto & Funk*, 17 C. C. P. A. 342, T. D. 43777), and it would seem that where an exemption is given when a commodity is used in a certain manner, the commodity itself must be used for that purpose. In the instant case the imported merchandise was first used to obtain two products and then one of them was used for the specified purpose. We do not think Congress intended to follow a commodity through its various changes and then assess duty on the basis of the ultimate use of a part thereof.

In *Peat Products Corp.* v. *United States*, 35 C. C. P. A. 84, C. A. D. 375, the merchandise consisted of peat moss, poultry grade, which was claimed to be entitled to free entry under paragraph 1685 as a substance "used chiefly for fertilizers, or chiefly as an ingredient in the manufacture of fertilizers." The merchandise was used in its im-

ported condition as litter or bedding in chicken houses where it was "allowed to remain on the floors of the houses for a considerable period during which it becomes impregnated with chicken droppings, and the resultant product of peat and chicken droppings is used as a fertilizer." The court held that the chief use of the merchandise at the time of importation was as bedding in chicken houses and that it was not used either as fertilizer or as an ingredient in the manufacture of fertilizer. The first use, not the second use, of the merchandise was controlling.

The regulations issued by the Secretary of the Treasury in connection with Public Law 211 (Code of Federal Regulations, title 19, sec. 58, T. D. 50983) provide that the exemption does not apply "to flaxseed or cottonseed for oil milling, nor to other merchandise to be processed for the purpose of producing a product which is not to be used as, or as a constituent part of, feed for livestock or poultry." This regulation was issued under a specific statutory provision, is entirely reasonable, does not render inoperative any right granted by Congress, and is therefore mandatory. *United States* v. *Morris European & American Express Co.*, 3 Ct. Cust. Appls. 146, T. D. 32386; *United States* v. *Ricard-Brewster Oil Co.*, 29 C. C. P. A. 192, C. A. D. 191; *United States* v. *Browne Vintners Co., Inc.*, 34 C. C. P. A. 112, C. A. D. 351; *Kerr-Gifford & Co., Inc.* v. *United States*, 15 Cust. Ct. 187, C. D. 969.

We find that the imported merchandise, flaxseed, was not used as, or as a constituent part of, feed for livestock or poultry, and is therefore not entitled to the exemption from duty granted in Public Law 211.

The Government claims that the merchandise herein is not entitled to free entry for another reason, namely, that it was imported prior to the effective date of the statute. The record shows that the imported flaxseed arrived in Cleveland by steamer from Canada on December 7, 1943; that the steamer was received and placed in winter storage; that is, the Government held the ship until it was ready to unload; that the merchandise was entered on January 27, 1944, and withdrawn from Government custody for consumption on January 28, 1944. Public Law 211 was enacted on December 22, 1943, and provides exemption from duty for certain commodities "when imported into the United States from foreign countries, and when entered, or withdrawn from warehouse, for consumption, during the period of ninety days beginning with the day following the date of the enactment of this joint resolution."

The merchandise involved herein arrived in this country prior to the enactment of the statute but was entered and withdrawn for consumption during the effective period thereof.

In *Quaker Oats Co.* v. *United States*, 20 Cust. Ct. 29, C. D. 1079, we held that in order to be entitled to free entry under the provisions of Public Law 272 (an extension of Public Law 211), the merchandise must be both imported and entered prior to the expiration date of the statute. There, the merchandise entered the waters of the United States on June 18, 1944, and arrived within the limits of the port of Chicago on June 20, 1944 (subsequent to the expiration of the statute). Entry was tendered on June 19 but was not accepted until June 20, after the merchandise had arrived. Plaintiff claimed that the statute should be construed to include grains and grain products imported *or* entered prior to June 20, 1944. We held, however, that one of the conditions attached to the privilege of free entry was that the merchandise be imported *and* entered prior to the expiration date. It was also held that the merchandise in that case had not been imported prior to the expiration date since the ship had not arrived within the limits of the port of Chicago until June 20, 1944, citing *United States* v. *Vowell and M'Clean*, 5 Cranch 368; *Arnold* v. *United States*, 9 Cranch 104; *Meredith and Ellicott* v. *United States*, 13 Peters 486; *United States* v. *Edwin S. Hartwell Lumber Co.*, 142 Fed. 432, cert. denied, 201 U. S. 644; *United States* v. *Estate of Boshell*, 14 Ct. Cust. Appls. 273, T. D. 41884; *O. E. Barrant* v. *United States*, 73 Treas. Dec. 128, T. D. 49363; *Tassini & Salisch-Parver, Inc.* v. *United States*, 6 Cust. Ct. 571, Abstract 45512; *Mata* v. *United States*, 19 F. 2d 484; *The Przemysl*, 23 F. 2d 336.

*William J. Oberle, Inc.* v. *United States*, 4 Cust. Ct. 319, C. D. 351, involved a paragraph of a Cuban Trade Agreement (T. D. 47232) which provided:

774. Okra in its natural state, when imported and entered for consumption during the period from December 1 to the following May 31, inclusive, in any years.

It was held that merchandise which had been imported on November 29, 1937, and entered on December 1, 1937, was not "imported" during the period mentioned in the trade agreement and that the fact that it was entered during that period did not satisfy the terms of the agreement, namely, "imported and entered."

The exemption in Public Law 211 is granted to the specified merchandise, when used as feed for livestock, under two other conditions: (1) "when imported into the United States from foreign countries," "during the period of ninety days beginning with the day following the date of enactment of this joint resolution"; and (2) "when entered, or withdrawn from warehouse, for consumption," "during the period of ninety days beginning with the day following the date of enactment of this joint resolution." The clauses beginning with the words "when imported" and "when entered" are co-ordinate and both are modified by the phrase "during the period of ninety days beginning with the

day following the date of enactment of this joint resolution." Both conditions must be satisfied before the merchandise is entitled to the exemption.

The Government claims also that plaintiff failed to comply with the regulations requiring the filing of affidavits of intended use and proof of use, since these affidavits were returned to the plaintiff at its request. At the trial counsel for the plaintiff stated that the original affidavit called for by the regulations, was executed by Mr. Murphy of The Sherwin-Williams Co. and filed with the collector; that subsequently an affidavit showing the processing and sale of cattle feed from this particular shipment was executed by M. W. Pascal and filed with the collector; that on June 27, 1944, The Sherwin-Williams Co. requested that these affidavits be returned to it, and that the collector returned them under date of August 19, 1944, stating that the entry had been liquidated that day. These affidavits were received in evidence, together with two letters of The Sherwin-Williams Co., dated June 6 and June 27, 1944, and the letter of the collector dated August 19, 1944 (plaintiff's exhibits 1 to 5, inclusive).

There is nothing in the record to show why plaintiff made its request, and the Government claims that the return of the affidavits was tantamount to a non-filing thereof. We are unable to agree with this contention since they were not returned prior to liquidation and were before the collector at that time.

For the reasons stated above, we hold that the flaxseed involved herein was properly dutiable as assessed by the collector at 32½ cents per bushel of 56 pounds under paragraph 762 of the Tariff Act of 1930, as modified by the trade agreements with Argentina and Uruguay (T. D. 50504, T. D. 50786). Since no issue was raised as to the screenings, we hold that duty was properly assessed thereon at the rate of 5 per centum ad valorem under paragraph 731, as modified by the trade agreement with Canada (T. D. 49752). The protest is overruled and judgment will be rendered accordingly.