**DAYTON NEWSPAPERS, INC., Plaintiff,**

v.

**TEAMSTERS LOCAL UNION NO. 957, Defendant.**

**No. C–3–97–392.**

United States District Court, S.D. Ohio, Western Division at Dayton.

May 7, 2001.

James M. Hill, O'Diam, McNamee & Hill Co., Dayton, OH, for plaintiff.

John Robert Doll, Logothetis Pence and Doll, Dayton, Oh, for defendant.

## DECISION AND ORDER

MERZ, United States Magistrate Judge.

This case is before the Court for decision on Defendant's [Second] Motion (Doc. No. 57) for an Order requiring Plaintiff to show cause why it should not be held in civil contempt for failing to obey the Court's Order of May 11, 1998, enforcing the June 2, 1997, Arbitration Award.

### Procedural History

Plaintiff Dayton Newspapers, Inc., ("DNI") brought this action to set aside an arbitrator's award on behalf of Patricia Bonner; Defendant Teamsters Local Union No. 957 ("Local 957") counterclaimed for enforcement of the award. On May 11, 1998, the Court, deciding cross-motions for summary judgment, judgment enforced the award (Doc. ## 26, 27). DNI appealed, the Court stayed enforcement pending appeal, and the Sixth Circuit affirmed (Doc. ## 28, 38, 42). Following receipt of the mandate, Local 957 instituted contempt proceedings, alleging DNI had not complied with the judgment.

On Local 957's first contempt motion (Doc. No. 44), the Magistrate Judge certified the relevant facts to District Judge Dlott, from whom the case had been referred, and recommended that she set a date certain for a final contempt hearing (Doc. No. 51). Based upon subsequent proof that DNI had offered Ms. Bonner reinstatement to actual employment as of March 13, 2000, the Magistrate Judge then withdrew the Certificate of Facts, finding that DNI had purged itself of contempt by the offer (Doc. No. 55).

On November 1, 2000, Local 957 renewed the contempt proceedings with the instant motion. The Court took evidence on January 23 and February 5, 2001, and the parties completed briefing the matter on April 2, 2001.

### Magistrate Judge Authority on the Contempt Motion

At the outset of this case, the parties unanimously consented (Doc. # 7) to plenary magistrate judge authority under 28 U.S.C. § 636(c). The consent of the parties expressly includes "all post-trial matters" and neither party questioned the authority of the Magistrate Judge to decide the original contempt motion.

At the time the first contempt motion was adjudicated, however, magistrate judge authority to final adjudicate civil contempt motions in a plenary consent case was not free of doubt. Because that question is akin to subject matter jurisdiction questions, the Court raised it *sua sponte. See Mansfield, C. & L M. Ry. v. Swan,* 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed.

462 (1884); *Louisville & Nashville R. Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908); *Sumner v. Mata,* 449 U.S. 539, 548, n. 2, 101 S.Ct. 764, 770, n. 2, 66 L.Ed.2d 722 (1981).

In declining to finally adjudicate the first contempt motion, the Court wrote:

28 U.S.C. § 636(e) provides:

(e) In a proceeding before a magistrate, any of the following acts or conduct shall constitute a contempt of the district court for the district wherein the magistrate is sitting: (1) disobedience or resistance to any lawful order, process, or writ; (2) misbehavior at a hearing or other proceeding, or so near the place thereof as to obstruct the same; (3) failure to produce, after having been ordered to do so, any pertinent document; (4) refusal to appear after having been subpenaed [subpoenaed] or, upon appearing, refusal to take the oath or affirmation as a witness, or, having taken the oath or affirmation, refusal to be examined according to law; or (5) any other act or conduct which if committed before a judge of the district court would constitute contempt of such court. Upon the commission of any such act or conduct, the magistrate shall forthwith certify the facts to a judge of the district court and may serve or cause to be served upon any person whose behavior is brought into question under this section an order requiring such person to appear before a judge of that court upon a day certain to show cause why he should not be adjudged in contempt by reason of the facts so certified. A judge of the district court shall thereupon, in a summary manner, hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a judge of the court, or commit such person upon the conditions applicable in the case of defiance of the process of the district court or misconduct in the presence of a judge of that court.

In the case of *Miami Valley Carpenters Dist. Council Pension Fund v. Scheckelhoff,* 123 F.R.D. 263 (S.D.Ohio 1988), this Court was confronted with precisely the same question presented here: the authority of a magistrate judge to conduct civil contempt proceedings after judgment and in aid of injunctive relief. This Magistrate Judge concluded that the later-adopted § 636(c) authorized exercise of civil contempt authority to enforce an injunctive argument for reasons of statutory interpretation set forth there at length and quoted here in the margin[1].

---

1. The Magistrates' Act was not adopted all at once in its present form. The original act, Pub.L. 90–578, 82 Stat. 1107, was the result of extensive hearings held in the United States Senate in 1966 and 1967. The thrust of the legislation was to create the magistrate system to replace the old United States Commissioner system, to require bar membership for the first time, and to expand the duties of the magistrates to assist district courts. The initial powers conferred were quite limited, including service as a special master under Rule 53, assistance to district judges in conducting pretrial proceedings, and preliminary review of habeas corpus petitions. McCabe, The Federal Magistrate Act of 1979, 16 Harv.J. on Legis. 343, 349–50 (1979).

Section 636(e), then labeled § 636(d), was a part of the original 1968 Act. Its inclusion reflected the need to protect order in magistrate proceedings, as in all court proceedings, compromised by doubts about constitutionality of permitting magistrates, as non-Article III judges, to punish for contempt. The same debates reflect doubt over whether magistrates should be permitted to try criminal offenses over the petty offense level, a doubt resolved in favor of granting the authority.

The subsequent history of the Magistrates' Act is of amendments gradually increasing the scope of authority to meet both increased need in the district courts and increased confidence in the system which had been created. The Act was amended in 1976 (Pub.L. 94–

Subsequent case law casts doubt on

577, 90 Stat. 2729) specifically to permit magistrates to conduct evidentiary hearings in habeas corpus cases and to hear Social Security appeals, along with additional duties. In so doing, Congress eliminated doubts about its intentions as to the breadth of the 1968 Act. See *Wingo v. Wedding*, 418 U.S. 461, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974), and *Mathews v. Weber*, 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976).

Finally, in 1979, 28 U.S.C. § 636(c) was added to the Act. In pertinent part it provides:

> (c) Notwithstanding any provision of law to the contrary—(1) Upon the consent of the parties, a full-time United States magistrate ... may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves ...

Witnesses in Congressional hearings on the 1979 amendment virtually unanimously supported expansion of the civil jurisdiction in the manner eventually adopted. H.R.Rep. No. 95 1364, 95th Cong., 2d Sess. 9 (1978). The Judicial Conference of the United States in September, 1981, after studying the impact of the amendments, concluded that the system was working well and that magistrate jurisdiction should remain coextensive with that of the district courts. Report of the Judicial Conference of the U.S. to the Congress on the Federal Magistrate System, 39 (1981).

In light of this statutory history, I conclude that it is proper for me as a United States Magistrate to exercise jurisdiction over the contempt proceedings in this case.

Section 636(e) was adopted as part of the original Magistrates' Act at a time when there were serious doubts and confusion over what authority could constitutionally be granted to a United States Magistrate. It must be read in pari materia with § 636(c) which provides that "notwithstanding any provision of law to the contrary" magistrates may conduct "any or all proceedings" in a civil matter. While Congress did not specifically amend § 636(e) in 1979 (except to change the designation by adding (c) as an earlier subsection), there is no good reason to read an exception into the language of § 636(c) so that magistrates could conduct any proceeding except a contempt proceeding upon consent of the parties. The usual canon of statutory construction by which a later statute is held to repeal an earlier one with which it is in conflict is also available to support this conclusion, since

subsection (c) was added eleven years after subsection (e) was first adopted.

The language of § 636(e) itself, apart from the impact of § 636(c), does not preclude the exercise of contempt jurisdiction here. The Supreme Court has been careful to distinguish between civil and criminal contempt on the basis of the nature of the relief granted; if the relief is coercive, the contempt is civil; if the relief is a determinate sentence and therefore punitive, the contempt is criminal. *Hicks v. Feiock*, 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). Measured against this distinction, § 636(e) appears to deal with criminal contempt. It provides that when a magistrate certifies facts allegedly constituting contempt, the district judge is to determine if the conduct complained of "is such as to warrant punishment" and if so, "punish such person." (Emphasis supplied). This conclusion is not crystal clear, for § 636(e) also permits the district judge to "commit such person upon the conditions applicable in the case of defiance of the process of the district court," a provision for what looks like coercive imprisonment used for civil contempt. The conclusion that § 636(e) is about criminal contempt is reinforced, however, by the kinds of conduct mentioned as constituting contempt, largely acts of direct contempt tending to disrupt ongoing judicial proceedings and therefore acts usually dealt with by criminal contempt sanctions.

In contrast, the contempt asserted here is pure civil contempt. Defendants' asserted failure to comply with the consent judgment is contemptuous conduct directed at the other parties to this litigation, the Plaintiffs, and not at the Court; it is therefore appropriately classified as indirect contempt. *State, ex rel. Waller, v. Industrial Commission*, 44 Ohio L.Abs. 618, 620, 66 N.E.2d 148 (1944). Clearly, the relief sought by Plaintiffs is compensatory: further enforcement of the Consent Decree in this case and attorney fees and costs (Motion for Order to Show Cause, Doc. # 11, p. 4). Such civil contempt proceedings are common methods of enforcing consent injunctive relief. Wright and Miller, Federal Practice and Procedure, Civil, § 2960. Defendants explicitly consented to the use of civil contempt proceedings to enforce the judgment when they signed the Consent Judgment Entry (Doc. # 10, p. 2). Whatever may be said for limiting magistrate power to punish direct criminal contempts, § 636(e) does not prevent exercise of civil contempt juris-

whether the *Scheckelhoff* decision is correct. While no Circuit Court has ever expressly disagreed with its argument, neither has it been expressly adopted. In *Bingman v. Ward*, 100 F.3d 653 (9th Cir.1996), *cert. denied*, 520 U.S. 1188, 117 S.Ct. 1473, 137 L.Ed.2d 686 (1997), the court held that magistrate judges have authority to adjudicate neither civil nor criminal contempts, although the case itself involved only a criminal contempt finding. The Ninth Circuit panel cited authority from other circuits holding magistrate judges cannot try contempts in cases before them, even under § 636(c). See *Bingman*, 100 F.3d at 657, citing *Grimes v. City & County of San Francisco*, 951 F.2d 236 (9th Cir. 1991); *Taberer v. Armstrong World Indus., Inc.*, 954 F.2d 888, 907 (3d Cir. 1992); *Geras v. Lafayette Display Fixtures, Inc.*, 742 F.2d 1037, 1044 (7th Cir.1984); *Collins v. Foreman*, 729 F.2d 108, 117 (2d Cir.), *cert. denied*, 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); *Proctor v. State Gov't of North Carolina*, 830 F.2d 514 (4th Cir.1987). In addition, the Judicial Conference of the United States has sponsored legislation [2] which would amend § 636(e) to confirm the civil contempt power of magistrate judges in § 636(e) cases; by inference, that power is not clear without the amendment.

Although the Sixth Circuit has not spoken on this precise point, it would be unfair to the parties for the undersigned to insist on his position in *Scheckelhoff* and thereby perhaps waste judicial resources by creating an issue for another appeal in this case. Without retreating from the logic of *Scheckelhoff,* the Court will follow the Fourth Circuit's guidance in *Proctor, supra,* and certify the relevant facts to District Judge Dlott.

Decision, Order, and Certificate of Facts, Doc. No. 51.

Since the decision of the first contempt motion, the law has changed. The Federal Courts Improvement Act of 2000 was signed into law on November 13, 2000 (P.L. 106–518, 114 Stat. 2410) [3]. It replaced the former 28 U.S.C. § 636(e), quoted above, with, in relevant part, the following:

(e) Contempt Authority

(1) In General. A United States magistrate judge serving under this chapter shall have within the territorial jurisdiction prescribed by the appointment of such magistrate judge the power to exercise contempt authority as set forth in this subsection. . . .

(4) Civil Contempt Authority in Civil Consent and Misdemeanor Cases. In any case in which a United States magistrate judge presides with the consent of the parties under subsection (c) of this section, . . . the magistrate judge may exercise the civil contempt authority of the district court.

■ The authority to punish for contempt is an inherent power of all American courts. *Ex Parte Robinson*, 86 U.S. (19

---

diction in a full consent § 636(c) proceeding such as this one.

**2.** See, e.g., H.R. 2294, the "Federal Courts Improvement Act of 1997," at § 305.

**3.** The Federal Courts Improvement Act of 2000 contains no effective date and so is presumed to be effective as of the date it became law. *Gozlon–Peretz v. United States*, 498 U.S. 395, 404, 111 S.Ct. 840, 112 L.Ed.2d

919, 930 (1991), citing *Robertson v. Bradbury*, 132 U.S. 491, 10 S.Ct. 158, 33 L.Ed. 405 (1889), and *Arnold v. United States*, 13 U.S. 104, 9 Cranch 104, 3 L.Ed. 671 (1815); *Qasguargis v. INS*, 91 F.3d 788 (6th Cir.1996). Since it effects only a procedural and not a substantive change, it may constitutionally be applied to pending cases. *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

Wall.) 505, 22 L.Ed. 205 (1873); *Hale v. State*, 55 Ohio St. 210, 45 N.E. 199 (1896); *Zakany v. Zakany*, 9 Ohio St.3d 192, 459 N.E.2d 870 (1984). Indeed, the seventeenth section of the Judiciary Act of 1789 provides that all the courts of the United States "shall have power ... to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same." *Robinson*, 86 U.S. at 510, 22 L.Ed. 205. In *Robinson*, the Supreme Court recognized, however, the power of Congress to limit exercise of the contempt powers by the courts it had created under Article III as it had done in the Act of March 2, 1831[4] . As limited by that statute, however, the contempt authority of district courts plainly embraces power "to enforce obedience to their lawful orders, judgments, and processes." *Id.* at 511, 22 L.Ed. 205. It matters not whether the disobedience occurs in court or out. *Young v. United States, ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987).

▆ Whereas criminal contempt is punitive in nature, civil contempt is remedial and the sanction may be either coercive or compensatory. *Shillitani v. United States*, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); see also *Hicks v. Feiock*, 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). Neither the Judicial Code, Title 28, nor the Federal Rules of Civil Procedure prescribe any mode of proceeding in civil contempt. This Court has accordingly proceeded by Order to Show Cause advising the alleged contemnor of the elements of the claimed contempt and outlining that party's rights. The party

seeking the civil contempt sanction bears the burden of proof by clear and convincing evidence. *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, (6th Cir.1987); *Reed v. Rhodes*, 635 F.2d 556 (6th Cir. 1980), modified 642 F.2d 186 (6th Cir. 1981); *Consolidation Coal Co. v. Local Union No. 1784, U.M.W.*, 514 F.2d 763 (6th Cir.1975).

### Analysis

With these principles in mind, the Court turns to the analysis of the instant motion.

The dispute between Patricia Bonner and her employer is part of an ongoing struggle between DNI and Local 957. The overall contours of that struggle are not before the Court, nor is the Court required to make any specific findings of fact related to that controversy in resolving this dispute. However, that struggle has at least colored the manner in which this dispute has been handled by the parties and may in fact have structured it. The acrimonious exchanges between counsel by correspondence and on the Motion bespeak the posture of colonels on opposite sides of a vast battle, obliged by orders from anonymous generals to labor on and never yield an inch, rather than of opposing counsel trying to resolve what would otherwise be a simple employment dispute. The Court desires to decide merely the dispute before it and to avoid engagement in the war, particularly avoiding furnishing rhetorical ammunition to either side.

That said, this Court determined in February, 2000, that DNI's failure to reinstate Ms. Bonner as of that date constituted

---

**4.** That Act was introduced by future President James Buchanan in the wake of a summary contempt proceeding by federal (and Federalist) Judge Peck against a lawyer who had uttered disparaging words about Judge Peck out of the court's presence. Although Judge Peck was merely following the English precedent set in *Almon's Case*, he narrowly escaped impeachment and the Act limiting the contempt power passed Congress readily and was copied in virtually every State.

disobedience of this Court's final judgment enforcing the arbitration award. DNI has not persuaded the Court that that prior determination was in error and it will stand now as the judgment of the Court.

The Court further concluded on March 9, 2000 (Doc. No. 55), that DNI had purged itself of that contempt by offering to reinstate Ms. Bonner to her prior position effective March 13, 2000 (*Id.*, attached March 8, 2000, letter of Brett Thurman to John Burns). The question now before the Court is whether DNI has again placed itself in contempt by terminating Ms. Bonner for purportedly abandoning her job by not appearing at work on March 20 or 21, 2001.

In the March 8, 2000, letter, Mr. Thurman included the following language:

DNI would normally require an employee returning after such a long time away to undergo a pre-employment drug screen, and will (if the union wants strict adherence to all standard procedures) instead move her reinstatement back to March 20 so she can use the week of March 13 to go through that procedure. However, if the union for any reason objects to this procedure, DNI will forego it and put her physically back to work on March 13, 2000 without first undergoing the drug screen.

On March 10, Mr. Doll responded on behalf of the Union. He prefaced his actual response with language illustrative of the good relations among the parties: "Local 957 finds the contents of Mr. Thurman's letter to be the epitome of corporate arrogance and a further demonstration of DNI's total contempt of the judicial process." Pleasantries out of the way, Mr. Doll continued:

However, to insure that Ms. Bonner's rights are not trampled on when she returns to work, Local 957 wants Ms. Bonner to submit to the pre-employment drug screen on the same basis as

all other employees returning to work after a long absence. Please have Mr. Thurman contact Mr. Burns to make the appropriate arrangements to have Ms. Bonner provide a sample for the drug screening. Additionally, prior to any sample being provided or drug screening being conducted, Local 957 requests a copy of DNI's pre-employment drug screening policy so that Local 957 can ensure that Ms. Bonner is being treated fairly and provided appropriate due process. Assuming this information can be provided promptly and the drug screen results can be obtained and reviewed by Local 957 by March 17, 2000, Ms. Bonner should be able to return to work on March 20, 2000.

March 10, 2000, letter of Doll to Hill, JX 15, transmitted by facsimile only. It is clear from the Union's argument that it intended this letter to set up a number of stages for Ms. Bonner's return to work: (1) DNI would furnish a copy of the policy and the procedure for giving a sample. (2) Once the Union was satisfied that the policy was appropriate, it would notify Ms. Bonner to provide a screening sample. (3) Ms. Bonner would then provide the sample. (4) The screening facility would test the sample. (5) The test results would be provided to the Union which would review them. (6) If the test results were satisfactory to the Union and it had time to determine this before March 17, 2000, then Ms. Bonner would return to work on March 20, 2000 (See Defendant's Post Hearing Brief, Doc. No. 74, at 16).

It is unclear when the Union first showed Ms. Bonner the letter of March 8, 2000, although it may have been as late as March 15, 2000 (Hearing Transcript at 115; hereinafter "Tr."). There is no indication Local 957 ever offered Ms. Bonner the choice provided in the letter of taking or not taking the drug screening. The first time she discussed the drug screening

was with John Burns of the Union on March 14 or 15, 2000 (*Id.*). As a result of that discussion, she decided to "make arrangements" to provide the sample (*Id.*). She claimed that the first time she was able to go to provide the sample was March 22, 2000 (Tr. 118) because she had to make an appointment and take time off from her present employer, Walgreen's; she was then employed at the Walgreen's store at Wayne and Wyoming Streets in Dayton (Tr. 119). She was at that time working a full forty-hour week, but some evenings and three days a week during daytime (*Id.*). Her schedule was quite varied (Tr. 135–36). The sample was provided at the Industrial Medical Center at 228 Troy Street (Tr. 120). The Medical Center did not provide the results on the spot (Tr. 122). Rather the procedure as she understood it was that the Medical Center would notify the newspaper of the results and she would be contacted either by the newspaper or by the Medical Center (*Id.*). She evinced no understanding that the results were to be reported to and evaluated by the Union.

It is unclear to the Court whether Ms. Bonner ever intended actually to return to work at DNI. Although she stated in testimony that she intended to return, her conduct is inconsistent with that intent. She never called DNI to tell them that she would not be there on March 20 or 21, 2000, nor did she ever report to work. She testified that she dropped by the building at some time on March 22 and talked with some former co-workers, but she did not report for employment. So far as the record shows, she never called to find out what had happened with the drug test. Although Walgreen's had a policy requiring two weeks notice before leaving, a policy she complied with when she eventually left Walgreen's to go to Victoria's Secret, she never notified Walgreen's that she intended to go back to DNI. And although DNI treated her as having abandoned her job as of March 21, 2000, she never filed a grievance over that until July, 2000.

■ It is also unclear to the Court whether Ms. Bonner would have gotten a fair opportunity to work at DNI if she had returned. In the same letter which DNI wrote to purge itself of contempt by offering reinstatement (the March 8, 2000, letter), it warned how much the workplace had changed since she had left and essentially put her on notice she would be under strict scrutiny as to job performance if/when she returned. It even advised her that she might not want to give up her present job. The Union's argument places a great deal of emphasis on this letter and the negative attitude toward Ms. Bonner's return which was evinced by the person who was to supervise her, Tom Wright.

The Court finds Ms. Bonner has not proven she was unable to provide a sample for drug testing before March 22, 2000. The evidence establishes there were five locations available at which to provide a sample, two of them within a ten-minute drive of Ms. Bonner's place of employment at Wayne and Wyoming[5]. While she was told appointments were preferred, she was also told walk-ins were acceptable. The Court has not been given her exact hours of employment at Walgreen's during the week between March 15 and 22, 2000, and therefore must conclude she was working her usual variant schedule. On that schedule, there were obviously many times consistent with her regular schedule to go

---

**5.** See JX 16, p. 4. Site # 2 is slightly west of downtown Dayton; site # 3 is slightly northeast. Wayne and Wyoming is slightly southwest. The approximate driving time is common knowledge in Dayton, Ohio, and therefore appropriate matter for judicial notice under Fed.R.Evid. 201.

to provide the sample without taking time off work. There was even provision for providing a sample after regular hours at St. Elizabeth's Hospital [6]. In any event, if she was "unable" to schedule the test before March 22, 2000, why didn't she notify someone at DNI that she could not come to work on March 20 or 21st?

Nor was her behavior after giving the sample consistent with her stated intention to return to DNI. The notice regarding testing said that she was to report to work unless notified not to. Instead of reporting or calling when she didn't hear, she did nothing. Indeed, no grievance was filed over her new termination until July, 2000.

The Court will not speculate about Ms. Bonner's reasons for behaving as she did. Nor will the Court speculate what part this minor skirmish was expected to play in the overall struggle between the parties. The sole question before the Court is whether DNI is in contempt for treating Ms. Bonner as having abandoned her job by not reporting to work on March 20 or 21, 2000. The Court concludes Local 957 has not proven the contempt by clear and convincing evidence. If she had returned, it may be that DNI would not have given her a fair opportunity to work, as the Union suggests would have been the case. However, that question is not before the Court because Ms. Bonner never returned to work.

The Court is quite concerned that the issue of Ms. Bonner's back pay is not yet structured for the Court to decide. The Court finds that Ms. Bonner is entitled to back pay from the date of her termination in 1996 through and including March 19, 2000, but not thereafter. Trial counsel for both parties are ordered to conduct a face-to-face conference at some date prior to May 18, 2001, to attempt to negotiate a back pay figure based on this finding. If they are unable to do so, they shall produce and file by May 22, 2001, a joint document which sets forth their respective positions on the back pay issue in sufficient detail to permit the Court to decide this question.

The parties' cross-motions for sanctions and attorney fees are denied.

---

6. Referred to at p. 4 of JX 16 as "Franciscan Medical Center—Dayton Campus Emergency and Trauma Center." Now that the hospital has closed, in part because of the corporate combination signified by the elaborate name, presumably its former operators will not object if Daytonians revert to the name by which it was known during the 100 + years of its successful existence.